STATE OF NORTH CAROLINA v. KIMBERLY BRAXTON FRITSCH
AKA KIMBERLY RAINS FRITSCH

No. 141PA99

(Filed 7 April 2000)

### 1. Homicide; Child Abuse and Neglect— child abuse—involuntary manslaughter—sufficiency of evidence

The trial court properly denied defendant's motion to dismiss charges of involuntary manslaughter and felonious child abuse, and the evidence supported defendant's convictions of involuntary manslaughter and misdemeanor child abuse, where there was evidence tending to show that the seven-year-old victim had cerebral palsy and was profoundly mentally retarded; the victim was absent from a developmental center for extended periods of time while in defendant's care and custody; the victim's weight dropped after these absences from the center and rose again after regular attendance; each time the victim returned to the center after extended absences, she had sores on her back and was dirty and unkempt; the DSS had twice substantiated neglect of the victim by defendant based upon observations of the victim's physical condition and defendant's continued failure to take the victim to a doctor for a physical examination; the victim's death was caused by "starvation malnutrition"; and there was no evidence that the victim could not digest and ingest food. Substantial evidence existed from which the jury could infer that defendant willfully, or through her culpable negligence, deprived the victim of food and nourishment and that the victim's death was caused by defendant's actions or inactions.

### 2. Evidence— death of child—DSS substantiation of prior neglect—admissibility to show intent

In a prosecution of defendant for involuntary manslaughter and abuse of a child who suffered from cerebral palsy and mental retardation, evidence that DSS had substantiated two cases of neglect of the victim by defendant did not invade the province of the judge and jury but was properly admitted to show defendant's intent where the trial court instructed the jury that this evidence could be considered only for the limited purpose of showing defendant's knowledge of the level of care she was required to provide to the victim.

Justice MARTIN concurring in part and dissenting in part.

**STATE v. FRITSCH**

[351 N.C. 373 (2000)]

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 132 N.C. App. 262, 511 S.E.2d 325 (1999), holding that the trial court erred in denying defendant's motions to dismiss and reversing a judgment entered by Cobb, J., on 26 March 1997 in Superior Court, Carteret County. Heard in the Supreme Court 17 November 1999.

> *Michael F. Easley, Attorney General, by Grady L. Balentine, Jr., Assistant Attorney General, for the State-appellant and -appellee.*
>
> *Stephen M. Valentine for defendant-appellant and -appellee.*

PARKER, Justice.

Defendant was indicted for felonious child abuse and involuntary manslaughter of her seven-year-old daughter (victim). The jury convicted defendant of nonfelonious child abuse and involuntary manslaughter. The convictions were consolidated for judgment, and the trial court sentenced defendant to a term of sixteen to twenty months imprisonment.

At trial the State's evidence tended to show that the victim suffered from cerebral palsy and severe mental retardation, functioning at the level of an infant. The victim died on 1 January 1996 at her home in Carteret County. The victim was a student at the Newport Developmental Center ("Center"), a therapeutic day program for children with special needs, from June 1989 until January 1992 and then again from April 1993 until 16 October 1995. While at the Center, the victim never exhibited any eating problems or inability to swallow. In February 1994 the victim weighed twenty-six and a half pounds. The victim was then absent from the Center from 8 June 1994 until 30 August 1994. When the victim returned on 30 August 1994, the Center observed that she was dirty and thinner and that she had sores on her back. The victim then weighed twenty-two pounds. The Center then contacted the Department of Social Services ("DSS") concerning the victim's physical condition. The DSS's investigation revealed that the victim had fresh and old bed sores on her spine, that the victim had a severe diaper rash, and that she appeared emaciated. The DSS then contacted Dr. William Stanley Rule for a child medical evaluation as to whether the victim's condition was due to neglect or her disability. The DSS's investigation also revealed that the victim had not been seen regularly by a physician. After the DSS substantiated a case for neglect of the victim, defendant entered into two intervention plans

with the DSS which included choosing a doctor to perform regular weight checks and medical examinations of the victim, having the victim followed by a home health agency or a similar organization, taking advantage of respite services for additional home support, obtaining counseling regarding defendant's care of the victim, having the victim attend the Center on a regular basis, and obtaining regular employment and independence. The DSS's service regarding this neglect complaint of the victim ended in May 1995.

Dr. Rule, an expert in the field of pediatrics, saw the victim from infancy in 1988 until 1992. According to Dr. Rule, the victim was a premature twin who had numerous medical problems, including severe kidney disease with a swollen left kidney, a collapsed lung, pulmonary disease, cerebral atrophy, and visual and hearing difficulties. Pursuant to the DSS's request to examine the victim, Dr. Rule concluded that

[t]he pressure sore and evidence of prior similar lesions, along with chronic diaper rash and diminished subcutaneous tissue, a possible sign of inadequate caloric intake, along with the apparent lack of consistent medical, home and medical follow-up of problems, all raise valid concerns regarding the child's care, regarding child care issues. There is no suggestion of abuse. . . . Cerebral palsy could possibly explain the child's size and growth status, but I still believe the situation is suspect. . . . The skin lesions and her diaper rash, those areas I felt were indicative of suboptimal care or poor care. I thought that the weight of the child was something that should raise concern.

After regular attendance at the Center, the victim weighed twenty-seven pounds on 21 September 1994. The victim was again absent from the Center from 4 January 1995 until 4 April 1995. On 4 April 1995 the victim weighed twenty-four and a half pounds. After numerous absences from the Center in April and May 1995, the victim weighed twenty-two and a half pounds on 10 May 1995.

The victim was again absent from the Center from 2 September 1995 until 2 October 1995. On 2 October 1995 the victim returned to the Center unkempt and with sores. The victim weighed twenty-three pounds. The Center contacted the DSS again regarding the victim's physical condition. On 4 October 1995 the DSS observed that the victim appeared emaciated; that her arms and legs were in a fetal position; that she looked and smelled bad; that she had crusted dirt between her toes and various folds of her skin; that her left foot was

swollen; and that she had pressure sores on her right foot, right ear, back, and the back of her head at the hairline. When questioned about the victim's physical condition, defendant responded that the pressure sores were actually ant bites that had not healed. The DSS then told defendant to take the victim to the doctor for a medical evaluation. On or about 19 October 1995, the victim was treated for an ear and upper respiratory infection; and the physical examination was rescheduled. However, defendant missed two scheduled appointments to have the victim physically examined. Despite numerous calls and visits to defendant's home and a mailed certified letter requesting contact, the DSS was unable to contact defendant until 18 December 1995. On 19 December 1995 the DSS stressed to defendant that the victim needed a physical evaluation and that she needed to be back at the Center. On 20 December 1995 the DSS substantiated neglect for "lack of proper care and lack of proper medical care" of the victim by defendant based on observations made at the Center on 4 October 1995 and defendant's continued failure to take the victim to a doctor for a physical examination. The victim died on 1 January 1996 before case workers were scheduled to visit defendant's home.

On 2 January 1996 Dr. John Leonard Almeida, Jr., a pathologist, performed an autopsy of the victim's body. The autopsy revealed that the victim weighed eighteen pounds at her death and that the victim's stomach contained approximately a quart of food. Dr. Almeida opined that the underlying cause of the victim's death was "starvation malnutrition." He "found no evidence that [the victim] could not digest and ingest food." Dr. Almeida further opined that

> the malnutrition was of relatively long standing chronic condition, and that the child had very little strength or energies left. And although she had been fed and had ingested a significant amount of food, that she was unable to use that food for the final meal to any useful purpose.

According to defendant, the victim was able to eat only pureed food prepared in a blender. Dr. Richard Stevenson, defendant's expert in pediatrics and developmental disabilities in children, testified that it was common for children with cerebral palsy to be malnourished. Although Dr. Stevenson never physically examined the victim, he reviewed the victim's medical records and concluded that the victim "had been significantly malnourished for at least two years prior to her death." Dr. Stevenson explained that

[the victim's] ability to eat was limited by the severity of her disability, so that she could only take in a certain number of calories. I think that she became malnourished and stay[ed] malnourished chronically. I think that malnutrition was then complicated by medical factors. Most importantly, I think her bed sores, and that the combination of [mal]nutrition and the bed sores, as well as intervening colds and other things like that, lead [sic] to a vicious circle of continued malnutrition, increased weakness and eventually, death.

In forming his opinions, Dr. Stevenson relied on a medical article that contained a study revealing that "43 percent of children with that severity of handicap [as the victim] were dead by age five and 70 percent were dead by age ten."

Defendant presented testimony of numerous family members and friends who testified that they witnessed defendant feeding the victim many times. They all attested to the fact that the feeding process was long and arduous since the victim had a difficult time swallowing food. They also testified that the victim had always been very thin for a child her age. Dr. Donald Jason, an expert in the field of forensic pathology, reviewed the victim's autopsy report and concluded that the victim died not from starvation malnutrition, but from severe dehydration since the stomach was not emptying properly. Defendant testified that the missed appointments for medical physicals were due to car problems. Defendant also testified that she kept the victim out of the Center during the winter months on account of the victim's respiratory problems.

Prior to trial on the charges of felonious child abuse and manslaughter, defendant filed five motions *in limine* to suppress the evidence of (i) the pathologist's conclusion that the victim died from the withholding of food; (ii) defendant's lifestyle; (iii) the injury to the victim's brother's eye; (iv) the victim's "diaper rash, bed sores, unclean or unsanitary appearance or evidence of marks, rashes, bites, [or] other conditions"; and (v) the four investigations by the DSS into allegations of neglect of the victim by defendant. The trial court granted defendant's first three motions, denied the fourth motion, and granted the fifth motion only with regard to the March 1994 and July 1994 DSS investigations into allegations of neglect of defendant's other children that were not substantiated.

At the close of the State's evidence and at the close of all the evidence, defendant moved to have the charges dismissed; the trial

STATE v. FRITSCH

[351 N.C. 373 (2000)]

court denied the motions. After the jury returned it verdicts, defendant renewed her motion to dismiss and moved to have the jury verdicts set aside; the trial court denied the motions.

Defendant appealed, arguing, *inter alia*, that the trial court erred by not granting her motions to dismiss the charges at the close of the State's evidence and at the close of all the evidence since there was insufficient evidence of the crimes charged. The Court of Appeals, agreeing with defendant, reversed the trial court, holding that "the State has failed to present substantial evidence of either felonious or misdemeanor child abuse, or of involuntary manslaughter," sufficient to survive defendant's motions to dismiss. *State v. Fritsch*, 132 N.C. App. 262, 271, 511 S.E.2d 325, 332 (1999). This Court allowed both the State's petition for discretionary review and defendant's conditional petition for discretionary review as to additional issues.

[1] The State contends that the Court of Appeals erred in holding that the trial court erred by denying defendant's motions to dismiss. The State argues that it presented substantial evidence of involuntary manslaughter and felonious or misdemeanor child abuse sufficient to survive defendant's motions to dismiss. We agree.

In *State v. Barnes*, 334 N.C. 67, 430 S.E.2d 913 (1993), this Court again reiterated the standard of review for motions to dismiss in criminal trials. The Court stated,

> This Court reviewed the law in *State v. Powell*, 299 N.C. 95, 261 S.E.2d 114 (1980):
>
> > Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied.
> >
> > If the evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator of it, the motion should be allowed.

*Id.* at 98, 261 S.E.2d at 117 (citations omitted). In reviewing challenges to the sufficiency of evidence, we must view the evidence in the light most favorable to the State, giving the State the bene-

fit of all reasonable inferences. *State v. Benson,* 331 N.C. 537, 544, 417 S.E.2d 756, 761 (1992). Contradictions and discrepancies do not warrant dismissal of the case but are for the jury to resolve. *Id.* The test for sufficiency of the evidence is the same whether the evidence is direct or circumstantial or both. *State v. Bullard,* 312 N.C. 129, 322 S.E.2d 370 (1984). "Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence." *State v. Stone,* 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988). If the evidence presented is circumstantial, the court must consider whether a reasonable inference of defendant's guilt may be drawn from the circumstances. Once the court decides that a reasonable inference of defendant's guilt may be drawn from the circumstances, then " 'it is for the jury to decide whether the facts, *taken singly or in combination,* satisfy [it] beyond a reasonable doubt that the defendant is actually guilty.' " *State v. Thomas,* 296 N.C. 236, 244, 250 S.E.2d 204, 209 (1978) (alteration in original) (quoting *State v. Rowland,* 263 N.C. 353, 358, 139 S.E.2d 661, 665 (1965)).

*Barnes,* 334 N.C. at 75-76, 430 S.E.2d at 918-19. "Both competent and incompetent evidence must be considered." *State v. Lyons,* 340 N.C. 646, 658, 459 S.E.2d 770, 776 (1995). In addition, the defendant's evidence should be disregarded unless it is favorable to the State or does not conflict with the State's evidence. *See State v. Earnhardt,* 307 N.C. 62, 67, 296 S.E.2d 649, 653 (1982). The defendant's evidence that does not conflict "may be used to explain or clarify the evidence offered by the State." *Id.* When ruling on a motion to dismiss, the trial court should be concerned only about whether the evidence is sufficient for jury consideration, not about the weight of the evidence. *See id.* at 67, 296 S.E.2d at 652.

Defendant was charged with felonious child abuse and involuntary manslaughter. The jury found defendant guilty of nonfelonious child abuse and involuntary manslaughter. To sustain a charge of felonious child abuse, the State must present substantial evidence that defendant is

> [a] parent or any other person providing care to or supervision of a child less than 16 years of age who intentionally inflicts any serious physical injury upon or to the child or who intentionally commits an assault upon the child which results in any serious physical injury to the child . . . .

N.C.G.S. § 14-318.4(a) (1999). To sustain a charge of misdemeanor child abuse, the State must present substantial evidence that defendant is

> [a] parent of a child less than 16 years of age, or any other person providing care to or supervision of such child, who inflicts physical injury, or who allows physical injury to be inflicted, or who creates or allows to be created a substantial risk of physical injury, upon or to such child by other than accidental means . . . .

N.C.G.S. § 14-318.2(a) (1999).

To sustain a charge of involuntary manslaughter, the State must present substantial evidence that defendant committed

> the unlawful and unintentional killing of another human being without malice and which proximately results from the commission of an unlawful act not amounting to a felony or not naturally dangerous to human life, or from the commission of some act done in an unlawful or culpably negligent manner, or from the culpable omission to perform some legal duty.

*State v. Everhart*, 291 N.C. 700, 702, 231 S.E.2d 604, 606 (1977).

Under the applicable standard of review, substantial evidence existed from which the jury could infer that defendant willfully, or through her culpable negligence, deprived the victim of food and nourishment, or that the victim's death was proximately caused by defendant's actions or inactions. State's evidence tended to show that the seven-year-old victim, who had cerebral palsy and was profoundly mentally retarded, was absent from the Center for extended periods of time while in the care and custody of defendant. In February 1994 the victim weighed twenty-six and a half pounds. After being absent from the Center from 8 June 1994 until 30 August 1994, the victim returned thinner, dirty, and with sores on her back. The victim's weight had dropped to twenty-two pounds. After another extended absence from the Center from 2 September 1995 until 2 October 1995, the victim returned unkempt and with sores, weighing twenty-three pounds. Responding to the Center's allegations of neglect on 4 October 1995, the DSS observed that the victim appeared emaciated, that she looked and smelled bad, that there was crusted dirt between her toes and in the various folds of her skin, and that she had numerous pressure sores. Dr. Rule, who examined the victim at the DSS's request, concluded that the victim's skin lesions and diaper rash were "indicative of suboptimal care or poor care. I thought that

the weight of the child was something that should raise concern." The State's evidence further showed that the Center never observed the victim having problems eating or swallowing food. When the victim attended the Center regularly, she gained and maintained weight. At no time did the victim weigh more than twenty-seven pounds. Defendant's expert, Dr. Stevenson, acknowledged that the evidence that the victim's weight dropped after extended absences from the Center and rose again after regular attendance would support the assumption that the victim was not being fed as opposed to suffering from chronic malnutrition. The victim's autopsy on 2 January 1996 revealed that the victim weighed eighteen pounds at the time of her death, that her death was caused by "starvation malnutrition," and that there was no evidence that the victim "could not digest and ingest food."

Moreover, the State's evidence showed that the Center contacted the DSS twice concerning the victim's physical condition. The DSS's 1994 investigation revealed that the victim had not been seen regularly by a physician. After the DSS substantiated a case for neglect of the victim, defendant signed two intervention plans which detailed the level of care that she was expected to provide for the victim, including, *inter alia*, regular doctor visits and regular Center attendance. As part of the DSS's 1995 investigation, defendant was to take the victim for a medical evaluation scheduled for 18 October 1995. The medical evaluation was rescheduled; however, defendant missed two scheduled appointments. The DSS substantiated neglect on 20 December 1995 for "lack of proper care and lack of proper medical care" based on observations of the victim's physical condition and the continued failure to take the victim to a doctor for a physical examination.

The State contends that the Court of Appeals improperly weighed the evidence by considering defendant's exculpatory evidence that was in conflict with the State's evidence. We agree. Comparing this case with *State v. Mason*, 18 N.C. App. 433, 197 S.E.2d 79, *cert. denied*, 283 N.C. 669, 197 S.E.2d 878 (1973), which involved an involuntary manslaughter conviction for the starvation death of a child who was found in squalid living conditions, the Court of Appeals described the victim in this case as one who "lived in a properly heated, well stocked home with several healthy, well-fed children." *Fritsch*, 132 N.C. App. at 270-71, 511 S.E.2d at 331. This description identifies a contradiction or discrepancy with the State's evidence of the victim's condition, which is for the jury to resolve. *See Benson*,

331 N.C. at 544, 417 S.E.2d at 761. The Court of Appeals also noted that the victim suffered from "several significant medical conditions," that no "treating or examining physicians ever recommended hospitalization or feeding the victim through the insertion of a gastrostomy tube," and that friends and family members never expressed great concern with the victim's well-being. *Fritsch*, 132 N.C. App. at 271, 511 S.E.2d at 331. This evidence conflicts with the State's evidence and could not properly be considered on a motion to dismiss. *See Earnhardt*, 307 N.C. at 67, 296 S.E.2d at 653.

We conclude that all the evidence, taken in the light most favorable to the State, was sufficient to support a finding that defendant was guilty of nonfelonious child abuse and involuntary manslaughter. The fact that some evidence in the record supports a contrary inference is not determinative on the motion to dismiss. Accordingly, the Court of Appeals erred in reversing the trial court's denial of defendant's motions to dismiss.

[2] Defendant contends that the trial court erred by denying defendant's motion *in limine* to suppress and by overruling defendant's objections during trial to evidence that DSS substantiated two cases of neglect of the victim by defendant. We disagree.

Defendant made a motion *in limine* to suppress evidence of four DSS investigations into allegations that defendant's children were neglected. The trial court granted the motion as to the DSS's March 1994 and July 1994 investigations that involved unsubstantiated allegations of neglect of defendant's other children. The trial court denied the motion as to the DSS's August 1994 and October 1995 investigations that involved substantiated allegations of neglect of the victim by defendant. The trial court permitted Pamela Stewart and Daniel Sullivan, employees of the DSS, to testify, over defendant's objection, that they investigated the Center's allegations of neglect by observing the victim's physical condition at the Center. Stewart testified that based on her observation in August 1994 of the "pressure sores, the weight loss, the diaper rash, and the fact that [the victim] had not been seen by a regular medical physician," the DSS substantiated a case of neglect of the victim by defendant. Based on his October 1995 observations of the victim, Sullivan testified that the DSS substantiated a case of neglect of the victim "for lack of proper care and lack of proper medical care" by defendant. The trial court instructed the jury that this evidence could be considered only for the limited purpose of "showing that the defendant had at least

some knowledge that the [DSS] had concerns regarding the level of care she was providing for her child," not as evidence of defendant's guilt.

The decision to either grant or deny a motion *in limine* is within the sound discretion of the trial court. *See State v. Hightower*, 340 N.C. 735, 746-47, 459 S.E.2d 739, 745 (1995). The trial court also has the sound discretion to exclude relevant but prejudicial evidence under Rule 403. *See State v. Handy*, 331 N.C. 515, 532, 419 S.E.2d 545, 554 (1992). The trial court must exclude evidence of other crimes, wrongs, or acts if the purpose of the evidence is to show defendant's propensity to commit the crime. *See State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990). However, such evidence may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident." N.C.G.S. § 8C-1, Rule 404(b) (1999). "Our courts have consistently held that past incidents of mistreatment are admissible to show intent in a child abuse case." *State v. West*, 103 N.C. App. 1, 9, 404 S.E.2d 191, 197 (1991).

Defendant contends that the testimony of the DSS employees that the DSS had substantiated a case of neglect of the victim by defendant was unduly prejudicial in that it invaded the province of both the judge and jury. In other words, the testimony was the equivalent of the involuntary manslaughter instruction given to the jury that "defendant's failure to act constituted a criminally negligent failure to perform a legal duty" and that "defendant's act proximately caused the victim's death." We disagree. The State contends that the evidence was not used to show defendant's propensity to commit the crime, but rather to show that defendant had knowledge of the level of care that she was expected to provide and maintain for the victim. The jury could infer from the evidence of the DSS's substantiation of neglect that defendant's failure to follow the two intervention plans provided by the DSS was not a mistake. We hold that defendant's past incidents of her failure to provide proper care for the victim are relevant and admissible to show intent. The trial court properly balanced the probative value of this relevant evidence for the State against any unduly prejudicial effect to defendant by giving a limiting instruction to the jury. Further, we note that the trial court granted defendant's motions *in limine* to suppress evidence of the pathologist's conclusion that the victim died from the withholding of food, of defendant's lifestyle, of the injury to the victim's brother's eye, and of two investigations by the DSS into unsubstantiated allegations of

neglect of other children. Therefore, we conclude that the trial court did not abuse its discretion in failing to grant defendant's motion *in limine* to suppress and in overruling defendant's objections during trial to evidence of the DSS's substantiation, based on its investigations, of allegations of neglect of the victim by defendant.

In conclusion, we affirm the decision of the Court of Appeals upholding the trial court's denial of defendant's motion *in limine* and overruling defendant's objections at trial to exclude evidence of the DSS's investigations. However, we reverse the Court of Appeals' decision reversing defendant's convictions.

REVERSED.

Justice MARTIN concurring in part and dissenting in part.

I concur in the majority's conclusion that the state presented sufficient evidence to survive defendant's motion to dismiss. I also agree that the underlying evidence of neglect, proffered by two lay witnesses for the limited purpose of showing defendant's knowledge of the level of care she was required to provide to the victim, was properly admitted. Nevertheless, I dissent from the majority's holding that the trial court did not commit prejudicial error when it allowed these same two lay witnesses to state repeatedly that they had "substantiated a case of neglect" against defendant.

Under N.C.G.S. § 8C-1, Rule 704, witnesses may offer an opinion that embraces an ultimate issue decided by the trier of fact. Neither a lay witness, nor *even* an expert witness, however, may suggest to the jury that a legal standard has been satisfied or otherwise testify to a legal conclusion. *See HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 587, 403 S.E.2d 483, 489 (1991); *see also State v. Smith*, 310 N.C. 108, 114, 310 S.E.2d 320, 324 (1984). In *HAJMM* this Court stated:

> From the Rules of Evidence, the advisory committee's notes, case law, and commentaries, we discern two overriding reasons for excluding testimony which suggests whether legal conclusions should be drawn or whether legal standards are satisfied. The first is that such testimony invades not the province of the jury but "the province of the court to determine the applicable law and to instruct the jury as to that law." *F.A.A. v. Landy*, 705 F.2d 624, 632 (2d Cir.), *cert. denied*, 464 U.S. 895, 78 L. Ed. 2d 232 (1983). It is for the court to explain to the jury the given legal

standard or conclusion at issue and how it should be determined. To permit the expert to make this determination usurps the function of the judge. The second reason is that an expert is in no better position to conclude whether a legal standard has been satisfied or a legal conclusion should be drawn than is a jury which has been properly instructed on the standard or conclusion.

*HAJMM*, 328 N.C. at 587, 403 S.E.2d at 489; *see generally* 1 KENNETH S. BROUN, BRANDIS AND BROUN ON NORTH CAROLINA EVIDENCE §§ 182, 190 (5th ed. 1998).

In the present case, the two lay witnesses were permitted to testify repeatedly at trial that DSS had "substantiated a case of neglect" against defendant. As District Attorney McFadyen correctly explained to the trial court, "The central issue in both of these charges is **neglect** . . . between April 1994 and October 1995." (Emphasis added.) In essence, the issue before the jury was whether defendant's alleged neglect led to the victim's death.

It was the trial court's duty to explain to the jury the legal standard of criminal negligence and how it should be determined. *See HAJMM*, 328 N.C. at 587, 403 S.E.2d at 489. By permitting the two lay witnesses to testify repeatedly as to administrative determinations of negligence against defendant, the province of the trial court to determine the applicable law on criminal negligence, and to instruct the jury on that law, was impermissibly invaded. *See id.* Moreover, the lay witnesses were in no better position than the jury to determine whether defendant was negligent after presentation of the underlying facts relevant to defendant's conduct and the trial court's proper instruction on the law of criminal negligence. *See id.*

The error arising from the erroneous admission of this evidence during presentation of the state's case-in-chief was not cured by the limiting instruction given by the trial court during its charge to the jury. Whether the prejudicial effect of incompetent evidence should be deemed cured by the trial court's instruction to disregard or give limited consideration to such evidence "depends upon the nature of the evidence and the circumstances of the particular case." *State v. Aycoth*, 270 N.C. 270, 273, 154 S.E.2d 59, 61 (1967). This Court has recognized that "some transgressions are so gross and their effect so highly prejudicial that no curative instruction will suffice to remove the adverse impression from the minds of the jurors." *State v. Britt*, 288 N.C. 699, 713, 220 S.E.2d 283, 292 (1975). " '[I]f the evidence

admitted is obviously prejudicial, and especially if it is emphasized by repetition or by allowing it to remain before the jury for an undue length of time, it may be too late to cure the error by withdrawal' or cautionary instructions." *Duke Power Co. v. Winebarger*, 300 N.C. 57, 67, 265 S.E.2d 227, 233 (1980) (quoting 1 HENRY BRANDIS, JR., STANSBURY'S NORTH CAROLINA EVIDENCE § 28, at 75-76 (Brandis rev. 1973)). In such cases, this Court "will not indulge in the usual presumption that the jury followed the letter and intent of the judge's instructions." *Id.*; *see Whitley v. Redden*, 276 N.C. 263, 273, 171 S.E.2d 894, 901 (1970).

In the present case, the record indicates that no contemporaneous curative instructions were given when the statements at issue were admitted. The trial court did, however, inform the jury during the general jury charge that the statements had been admitted solely for the purpose of demonstrating defendant's knowledge of the level of care she was to provide to the victim. This instruction was not sufficient to disabuse the jury of the impression that an administrative agency charged, among other things, with the duty of protecting children, had twice essentially found defendant to be guilty of neglect. Moreover, this prejudicial evidence was emphasized by repetition, and it remained before the jury throughout the entire course of the proceeding, without limitation. Therefore, the trial court's limiting instruction came too late to cure the prejudicial error.

Accordingly, I respectfully dissent.