An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA14-404
NORTH CAROLINA COURT OF APPEALS

Filed:  2 December 2014

STATE OF NORTH CAROLINA

    v.                                    Onslow County
                                        No. 12 CRS 54423
DARREN LYCELL SKINNER
    Defendant

_____

STATE OF NORTH CAROLINA

    v.                                    Onslow County
                                        Nos. 12 CRS 54424-25
HARRY D. NORTHINGTON, JR.
    Defendant


Appeal by defendants from judgments entered 20 December 2013 by Judge Jack W. Jenkins in Onslow County Superior Court. Heard in the Court of Appeals 10 September 2014.


    *Roy Cooper, Attorney General, by David W. Boone, Special Deputy Attorney General, and M. Denise Stanford, Assistant Attorney General, for the State.*

    *Patterson Harkavy LLP, by Narendra K. Ghosh, for defendant-appellant Darren Lycell Skinner.*

    *Staples S. Hughes, Appellate Defender, by Paul M. Green, Assistant Appellate Defender, for defendant-appellant Harry D. Northington, Jr.*


DAVIS, Judge.

Darren Lycell Skinner ("Skinner") and Harry D. Northington, Jr. ("Northington") (collectively "Defendants") appeal from their respective convictions for extortion and nonfelonious obstruction of justice. Northington also appeals from his convictions for second-degree kidnapping and conspiracy to commit second-degree kidnapping. After careful review, we conclude that Defendants received a fair trial free from prejudicial error.

**Factual Background**

The State's evidence at trial tended to establish the following facts: On the evening of 15 June 2012, Jane Roe[1] ("Roe") went to the home of Sarah Baglioni ("Baglioni") to babysit Baglioni's two children. Roe arrived at the house at approximately 10:45 p.m., and Baglioni, her boyfriend Chris Jones ("Jones"), and another woman, Brittany Morgan, left shortly afterward to go to Alexander's, a local nightclub. The children went to sleep, and Roe went outside on the porch to smoke marijuana and drink a shot of liquor. She then went back inside, turned on the TV, and fell asleep on the couch in the

---

[1] A pseudonym is used throughout this opinion to protect the privacy of the victim and for ease of reading.

living room. When Roe woke up, Baglioni had returned, and Roe overheard her informing someone over the telephone that a safe was gone. Approximately five minutes later, Jones arrived at the house and began questioning Roe about the safe's whereabouts. When Roe explained that she had been asleep and did not know where the safe was, Jones repeatedly hit her in the face. Jones then picked up a kitchen knife and threatened to stab her. Roe maintained that she did not know where the safe was, and Jones informed her that "one of his boys was coming over . . . [and] he was kind of crazy." Jones referred to the person as "Moisture," a nickname that Roe later discovered belonged to Northington.

When Defendants arrived at the house, Northington ordered that Roe be placed in the bathroom. Roe complied because she was afraid of Defendants and Jones. At that point, Northington, Jones, and Skinner — who went by the nickname "Menace" — followed her into the bathroom. Northington "smack[ed]" Roe's face with a butcher knife and then proceeded to place the tip of the knife to the back of her head, telling her that if she did not tell him where the safe was he was going to cut through the back of her head like "how butter slices." Northington told Roe to take off her clothes, and when she complied, he ran the

butcher knife up and down her body and told her he was going to slit her throat.

Northington instructed Roe to touch herself, causing Roe to fear that he was going to rape her. Jones then told Northington "that it was enough" and allowed Roe to put on her clothing. After Roe dressed, Skinner told her if she told anyone what happened, he would be the last person she saw from "the other end of the barrel." Northington told her that if she talked to anyone, they would come to her house and rape and kill her in front of her son and his father. Before she was allowed to leave, she was warned that she "was going to be followed home, to make sure [she] didn't stop at the police station." Roe left the residence and drove straight to the home of her son's father.

The next day, Roe told her mother and younger sister about these events. Roe's mother urged her to tell the police, but Roe refused at first because of Defendants' warning that they would kill her if she told anyone what had happened. She agreed to go to the hospital at around 10:00 p.m. that night because her head was hurting. Two law enforcement officers interviewed Roe at the hospital, took a statement, and photographed the injuries to her face and body.

On 12 February 2013, an Onslow County grand jury indicted Defendants on charges of first-degree kidnapping, felony conspiracy, extortion, and felonious obstruction of justice. The grand jury also returned bills of indictment charging Skinner with simple assault and charging Northington with assault with a deadly weapon.[2] The cases were joined, and a jury trial was held beginning on 16 December 2013.

On 20 December 2013, the jury returned verdicts finding Skinner guilty of nonfelonious obstruction of justice and extortion and not guilty of all remaining charges. The jury found Northington guilty of nonfelonious obstruction of justice, extortion, second-degree kidnapping, and conspiracy to commit second-degree kidnapping. The trial court sentenced Skinner to a presumptive-range term of 21 to 35 months imprisonment for extortion and 120 days imprisonment for nonfelonious obstruction of justice to begin at the expiration of the first sentence. The trial court consolidated Northington's kidnapping and conspiracy offenses and sentenced him to a presumptive-range term of 33 to 52 months imprisonment. The trial court consolidated the extortion and nonfelonious obstruction of justice offenses and sentenced Northington to 21 to 35 months

---

[2] The State later dismissed the assault charges against both Defendants.

imprisonment following the expiration of the first sentence. Defendants gave notice of appeal in open court.

**Analysis**

On appeal, Defendants contend that the trial court erred in denying their motions to dismiss the obstruction of justice charges based on the insufficiency of the evidence. Northington also argues that the trial court committed plain error in its instructions to the jury. We address each argument in turn.

## I. Obstruction of Justice

Defendants argue that their charges for obstruction of justice should have been dismissed because "there was no evidence that [Defendants'] conduct actually hindered the administration of justice." We disagree.

When reviewing a trial court's denial of a motion to dismiss for insufficient evidence, this Court must determine *de novo* "whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator . . . ." *State v. Fritsch*, 351 N.C. 373, 378, 526 S.E.2d 451, 455 (citation omitted), *cert. denied*, 531 U.S. 890, 148 L.Ed.2d 150 (2000). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion. Evidence must be viewed in the light most favorable to the State with every reasonable inference drawn in the State's favor." *State v. Lucas*, ___ N.C. App. ___, ___, 758 S.E.2d 672, 676 (2014) (internal citations and quotation marks omitted).

> In *In re Kivett*, 309 N.C. 635, 670, 309 S.E.2d 442, 462 (1983), our Supreme Court confirmed that "[o]bstruction of justice is a common law offense in North Carolina" that was not abrogated by Article 30 of Chapter 14 of the General Statutes, which sets out statutory "obstruction of justice" offenses. The Court then adopted the following definition of the common law offense: "'At common law it is an offense to do any act which prevents, obstructs, impedes or hinders public or legal justice. The common law offense of obstructing public justice may take a variety of forms . . . .'" *Id.* (quoting 67 C.J.S. *Obstructing Justice* §§ 1,2 (1978)).

*State v. Wright*, 206 N.C. App. 239, 241, 696 S.E.2d 832, 834-35 (2010). Thus, in order to survive Defendants' motions to dismiss the obstruction of justice charges, the State was required to present substantial evidence that Defendants "committed an act that prevented, obstructed, impeded, or hindered public or legal justice." *State v. Cousin*, ___ N.C. App. ___, ___, 757 S.E.2d 332, 338, *disc. review denied*, ___ N.C. ___, 762 S.E.2d 446 (2014).

At trial, Roe testified that both Defendants threatened her

life if she spoke with law enforcement officers or anyone else about what had happened to her. Specifically, Skinner told her if she told anyone what happened, he would be the last person she saw from "the other end of the barrel," and Northington said that if she talked to anyone, they would come to her home and rape and kill her in front of her son and his father. She further testified that once she was finally permitted to leave Baglioni's house, Defendants and Jones told her that she "was going to be followed home, to make sure [she] didn't stop at the police station." Roe stated that she drove by the police station that evening and thought about stopping to report the crimes committed against her but decided against it "because they told [her] they were going to kill [her], and [she] didn't want to put [her] family or [her]self in any more danger."

Roe testified that the next day, she spoke to her mother, who urged her to speak to the police but that she "didn't want to go" and "wasn't going to tell anybody" based on the threats Defendants made to her. That night, Roe acquiesced to her mother's request that she go to the hospital to seek treatment for her injuries. Her mother then informed her that two law enforcement officers were going to be there and would want to talk to her about what happened. It was only then that Roe gave

a statement and allowed the officers to photograph the injuries to her face and body.

Taken in the light most favorable to the State, Roe's testimony that because of Defendants' threats she delayed notifying law enforcement personnel about the crimes committed against her for approximately 18 hours constitutes substantial evidence that Defendants committed an act which prevented, obstructed, impeded or hindered public or legal justice. *See* Merriam-Webster's Collegiate Dictionary 623 (11th ed. 2005) (defining "impede" as "to interfere with or slow the progress of"); *id.* at 588 (defining "hinder" as "to make slow or difficult the progress of"; "to hold back"; or "to delay, impede, or prevent action"). Thus, because there was substantial evidence of each essential element of obstruction of justice and that Defendants were the perpetrators, we conclude that the trial court properly denied Defendants' motions to dismiss.

## II. Jury Instructions

Northington also argues that the trial court's jury instructions concerning the charge of felonious conspiracy were improper "because the doctrine of acting in concert, applied to the conspiracy charge, had the effect of eliminating the

requirement of a specific agreement to commit kidnapping." He admits that he failed to object to the jury instructions at trial and that our review is consequently limited to determining whether the alleged instructional error rose to the level of plain error.

> Under the plain error standard, defendant must show that the instructions were erroneous and that absent the erroneous instructions, a jury probably would have returned a different verdict. The error in the instructions must be so fundamental that it denied the defendant a fair trial and quite probably tilted the scales against him. It is the rare case in which an improper instruction will justify the reversal of a criminal conviction when no objection has been made in the trial court. In deciding whether a defect in the jury instruction constitutes plain error, the appellate court must examine the entire record and determine if the instructional error had a probable impact on the jury's finding of guilt.

*State v. Smith*, ___ N.C. App. ___, ___, 736 S.E.2d 847, 850-51 (2013) (citation and quotation marks omitted).

Northington points to the following portion of the trial court's instructions as the basis for his plain error argument:

> The defendant, Harry D. Northington, Jr., has been charged with feloniously conspiring to commit first-degree kidnapping.
>
> For a defendant to be guilty of a crime, it is not necessary that the

defendant do all of the acts necessary to constitute the crime. If two or more persons join in a common purpose to commit felonious conspiracy, each of them, if actually or constructively present, is guilty of a crime and also guilty of any other crime committed by the other, in pursuance of the common purpose to commit felonious conspiracy, or as a natural and probable consequence thereof.

The trial court then instructed the jury as to the elements of conspiracy to commit first-degree kidnapping. Northington contends that by instructing on the theory of acting in concert in conjunction with conspiracy to commit first-degree kidnapping, the trial court permitted the jury to find him guilty of conspiracy "based on mere guilt by association with Jones." He asserts that the acting in concert component of the instruction eviscerated the requirement of a specific agreement to commit kidnapping and instead allowed a finding of guilt based simply on proof that Northington shared a common purpose with Jones to "conspir[e] to commit some unspecified unlawful act." We disagree.

After explaining the elements of conspiracy to commit first-degree kidnapping, the trial court continued its instructions as follows:

If you find from the evidence, beyond a reasonable doubt, that on or about the alleged date, the defendant, Harry D.

Northington, Jr., agreed with Chris Jones and Darren Skinner to commit first degree kidnapping and that the defendant, Harry D. Northington, Jr., and those persons intended, at the time the agreement was made, that it would be carried out, it would be your duty to return a verdict of guilty as to the defendant, Harry D. Northington, Jr. If you do not so find, or have a reasonable doubt as to one or more of these things, you would not return a verdict of guilty of felonious conspiracy to commit first-degree kidnapping as to the defendant, Harry D. Northington, Jr., but will determine whether he is guilty of felonious conspiracy to commit second-degree kidnapping.

For you to find the defendant, Harry D. Northington, Jr., guilty of felonious conspiracy to commit second-degree kidnapping, the State must prove three things, beyond a reasonable doubt. First, that the defendant, Harry D. Northington, Jr., and Chris Jones and Darren Skinner entered into an agreement. Second, that the agreement was to commit second-degree kidnapping.

Second-degree kidnapping is the unlawful removal of a person from one place to another, without that person's consent, for the purpose of terrorizing that person.

And third, that the defendant, Harry D. Northington, Jr., and Chris Jones and Darren Skinner intended that the agreement be carried out at the time it was made.

If you find from the evidence, beyond a reasonable doubt, that on or about the alleged date, the defendant, Harry D. Northington, Jr., agreed with Chris Jones and Darren Skinner to commit second-degree

> kidnapping and that the defendant, Harry D. Northington, Jr., and those persons intended at the time the agreement was made that it would be carried out, it would be your duty to return a verdict of guilty as to the defendant, Harry D. Northington, Jr. If you do not so find, or have a reasonable doubt as to one or more of these things, it would be your duty to find the defendant, Harry D. Northington, Jr., not guilty.

These instructions, when viewed in their entirety, make clear that in order to find Northington guilty of conspiracy to commit kidnapping, the jury was required to determine that he specifically (1) entered into an agreement with his co-conspirators (2) to commit a kidnapping (3) that they intended to carry out at the time the agreement was made. *See State v. Roach*, 358 N.C. 243, 304, 595 S.E.2d 381, 420 (2004) ("[W]hen instructions, viewed in their entirety, present the law fairly and accurately to the jury, the instructions will be upheld."); *see also State v. Canady*, 191 N.C. App. 680, 689, 664 S.E.2d 380, 385 (2008) ("When reviewing jury instructions, it is not enough for the appealing party to show that error occurred in the jury instructions; rather, it must be demonstrated that such error was likely, in light of the entire charge, to mislead the jury." (citation and internal quotation marks omitted)), *disc. review denied*, 363 N.C. 132, 673 S.E.2d 662 (2009).

Although an instruction on the theory of acting in concert

generally permits a finding of guilt when the defendant does not complete each particular act constituting the crime himself but rather shares in a common purpose to commit the crime with his co-perpetrators, we believe that the instructions here — considered in their totality — were sufficiently clear in informing the jury that it was required to find that *Northington himself* entered into an agreement with others to commit a kidnapping. *See State v. Ledwell*, 171 N.C. App. 328, 333, 614 S.E.2d 412, 415 ("The crime of conspiracy is an agreement to commit a substantive criminal act . . . ."), *disc. review denied*, 360 N.C. 73, 622 S.E.2d 624 (2005). Moreover, we note that the jury ultimately found Northington guilty of conspiracy to commit *second-degree* kidnapping, and the trial court only included an instruction on acting in concert in its charge on conspiracy to commit *first-degree* kidnapping. Thus, assuming — without deciding — that the challenged portion of the jury instructions was erroneous, we conclude that Northington has failed to show plain error.[3]

---

[3] Northington also appears to make a brief argument that his conviction for conspiracy to commit second-degree kidnapping must be set aside because "[he] alone stands convicted of conspiracy" since Skinner was acquitted of the offense and the State voluntarily dismissed the conspiracy charge against Jones. While "[t]he general rule is that if all participants charged in a conspiracy have been legally acquitted, except the defendant,

## Conclusion

For the reasons stated above, we conclude that Defendants received a fair trial free from prejudicial error.

NO PREJUDICIAL ERROR.

Judges HUNTER, Robert C., and DILLON concur.

Report per Rule 30(e).

---

then the inconsistent charge or conviction against the sole remaining defendant must be set aside[,] . . . . the dismissal of a charge[] pursuant to a plea agreement does not constitute an acquittal at law." *State v. Saunders*, 126 N.C. App. 524, 527-28, 485 S.E.2d 853, 855 (1997). Thus, because Jones and Skinner were not *both* acquitted of conspiracy, the trial court was not required to set aside Northington's conspiracy conviction. *See State v. Essick*, 67 N.C. App. 697, 701, 314 S.E.2d 268, 271 (1984) ("In the absence of acquittals of all named co-conspirators, the defendant's conviction will stand.").