HUNTER, JR., Robert N., Judge.
Ayvonne Donte Brockington ("Defendant") appeals following verdicts convicting him of two counts of robbery with a dangerous weapon, two counts of assault with a deadly weapon inflicting serious injury, and one count of conspiracy to commit robbery with a dangerous weapon. On appeal, Defendant contends the trial court erred by: (1) denying his motion to dismiss the conspiracy to commit armed robbery charge; and (2) ordering restitution without considering Defendant's financial circumstances or ability to pay, in violation of N.C. Gen. Stat. § 15A-1340.36(a) (2016). We find no error.
I. Factual and Procedural Background
On 8 September 2014, a Mecklenburg County Grand Jury indicted Defendant with two charges of conspiracy to commit robbery with a dangerous weapon; two charges of robbery with a dangerous weapon; and two counts of assault with a deadly weapon inflicting serious injury. On 5 January 2015, another Mecklenburg County Grand Jury indicted Defendant with assault on a law enforcement officer inflicting serious bodily injury.
On 5 October 2015, the Mecklenburg County Superior Court called Defendant's case for trial. The State's evidence tended to show the following.
First, the State called Officer Andrew Studney, an officer in the Charlotte-Mecklenburg Police Department. ("CMPD") On 14 August 2014, Officer Studney was patrolling when a 911 dispatcher sent him a call reporting an assault with a deadly weapon at Innovation Drive. In less than five minutes, Officer Studney arrived at the New Renaissance apartment complex[1] on Innovation Drive. At first, Officer Studney did not see anything amiss, but as he traveled about the apartment complex, a young, black male, Demetrius English, sprinted towards Officer Studney's car and flagged him down. The man was covered in blood, panicked, breathing heavily, seemed very scared, and asked for help. Officer Studney flagged down a passing paramedic truck.
As the paramedics worked, Officer Studney questioned Demetrius. Demetrius told Officer Studney he was with a friend in a car and two people assaulted them with a hammer and a box cutter and robbed him of his smart phone. As Demetrius described his assaulters, Officer Studney believed the suspects were still in the area and relayed the information over the radio to other responding units. Demetrius told Officer Studney the incident occurred in the Little Rock Apartments, which neighbors Ole Boulevard, near 3200 Nobles Avenue. Demetrius also told Officer Studney the vehicle should be near Nobles Avenue because he believed his assaulters retreated into an apartment nearby after the attack.
Responding officers located the car. Officer Studney transported Demetrius to Nobles Avenue where Officer Studney saw a red Ford Focus. Officer Studney saw a "blood trail" on the ground from the car, on the sidewalk, and to a staircase, and blood was "everywhere" inside the car. Demetrius told Officer Studney he believed his attackers retreated to the building at 3200 Nobles, in an apartment on the left side of the third floor. Based on that information, Officer Studney searched that building, but did not locate any suspects.
Next, the State called Officer Jesse Rubino, an officer with the CMPD. On 14 August 2014, Officer Rubino received a call regarding an assault with a deadly weapon with injury at 3200 Nobles Avenue. Officer Rubino drove towards Nobles Avenue and arrived at Innovation Drive. When Officer Rubino arrived, a skinny, black male, Marc White, wore a shirt "soaked in blood" and spoke with officers. Marc told officers he and Demetrius were at a pool hall when an associate, Caldwell, asked for a ride to the east side of town. When he started to give Caldwell a ride, Defendant asked to be brought to West Boulevard/Little Rock Apartments instead. When they arrived at Little Rock Apartments, Marc and Demetrius were attacked by Caldwell and Defendant. The victim also told Officer Rubino he believed his assaulters ran to the apartment at 3200 Nobles Avenue.
Based on the victim's statements, Officer Rubino and other officers went to the location of the assault and found the car, a red Ford Focus. A large amount of blood was inside the vehicle and on the outside of the vehicle in the parking lot. Officer Rubino then walked around the area, trying to find the attackers and weapons. During this walk, Officer Rubino did not locate any suspects. However, Officer Rubino did locate a bloody hammer on the stairwell leading to the third floor of 3200 Nobles Avenue.
Officer Rubino then went to the hospital to take a statement from Demetrius. Demetrius told Officer Rubino he and a friend, Marc White, were at a pool hall that night. Demetrius's associate, Caldwell, text messaged Demetrius, asking for a ride to the east side of Charlotte. Demetrius picked up Caldwell and Defendant. Demetrius began driving towards the east side of Charlotte, but Defendant asked Demetrius to drive to Defendant's sister's place off of West Boulevard at Little Rock Apartments. Upon arriving at Little Rock Apartments, Caldwell and Defendant started assaulting Demetrius and Marc. Demetrius told Officer Rubino that Defendant had the hammer and hit the other victim in the back of the head. Caldwell had the box cutter, and was "slicing" Demetrius in the back. Demetrius was able to grab the hammer from Defendant and started beating Caldwell with the hammer. The men all ended up outside the vehicle, where Caldwell told Demetrius, "Hey, listen, we're just gonna grab what you've got and we're gonna get outta here."
Demetrius saw Defendant take Marc's pants, shoes, wallet, and keys. Caldwell then told Demetrius if Demetrius gave him his cell phone and the hammer, Caldwell would stop "beating you guys." Demetrius gave Caldwell the phone and hammer, and Caldwell and Defendant then ran behind 3200 Nobles Avenue.
The State called Demetrius English as its fourth witness. Demetrius's testimony regarding the early evening of 14 August 2014 matched what he told Officer Rubino.
Upon arriving at Little Rock Apartments, Marc parked his car and Caldwell and Defendant began to exit the car. Then, both back doors opened and closed. When the doors closed, Demetrius saw Marc being "beaten on the top of his head." Demetrius also felt cuts on the back of his neck. Demetrius turned around and began fighting Caldwell back and got the hammer from Defendant. Demetrius began hitting Caldwell with the hammer, in an attempt to defend Marc and himself.
Demetrius and Caldwell ended up fighting outside of the car. While Demetrius fought with Caldwell, Defendant pulled Marc out of the car and said, "Give me the money, keys to the car, take off all [your] clothes," amongst other things. Defendant also said he was going to put Demetrius and Marc in the trunk of the car after he took the keys. Caldwell then told Defendant that Defendant was "doing too much." Caldwell asked Demetrius for Demetrius's phone and the hammer and told Demetrius "[i]t will be all over if you just-after you just give me what I want." Demetrius wanted the assault to be over and gave Caldwell the hammer and his cell phone. Caldwell and Defendant then ran towards an apartment building.
After Defendant and Caldwell left, Demetrius checked on Marc. Demetrius and Marc sought help and knocked on apartment doors trying to get someone to call 911. Thereafter, the police and paramedics showed up, and Demetrius ran over to them.
Next, the State called Javon Caldwell. Caldwell knew Defendant since 2010. The week before 14 August 2014, the two saw each other every other day. On 14 August 2014, Caldwell and Defendant planned on going to see a woman with whom Caldwell was expecting a child. Caldwell planned on staying with the woman, so Defendant needed a ride elsewhere. Caldwell told Defendant that he would see if he could get Defendant a ride. Caldwell called several people for a ride and ended up contacting Demetrius.
Marc picked up Caldwell and Defendant. When Marc arrived, Defendant had a book bag, which Caldwell thought contained some shirts. When Marc first started driving Caldwell and Defendant, the plan was to bring them to East Charlotte. However, Caldwell told Defendant to call and make sure his sister was still awake, and after Defendant called, the location changed. The new plan was to bring Defendant to Little Rock Apartments.
When Marc turned into Little Rock, Caldwell saw Defendant put on blue latex gloves. Marc parked the car and Caldwell started to get out of the car when he heard Marc say either "Oh, s---," or "Oh, man, what the h---." Caldwell then got back in the car and saw Defendant "pulling the hammer from Marc's head." Demetrius grabbed the hammer out of Defendant's hand and started swinging at Caldwell. While Demetrius swung at Caldwell, Caldwell saw a box cutter on the seat. Caldwell picked up the box cutter and started swinging it.
Caldwell got out of the car, slammed the door on Demetrius's car, grabbed Demetrius's wrist, and pulled Demetrius out of the car. Caldwell then told Demetrius that he "had nothing to do with it." Demetrius responded, "That's your cousin. Yes, you do. Yes, you do. That's f---ed up. Y'all trying to rob us." Then the two began fighting outside the car. Sometime during the fight, Caldwell obtained the hammer from Demetrius, but dropped the box cutter. While Caldwell fought with Demetrius, he heard Defendant say something about putting Demetrius and Marc in the truck. Caldwell responded, "Are you tripping, bro [?]" and ran away.
Caldwell ran to an apartment building and knocked on doors, trying to find Defendant's sister. Caldwell dropped the hammer on the stairs to the third floor. About five minutes after running away from the fight, Demetrius met up with Caldwell on the side of the apartment building and asked Caldwell for his phone back. Demetrius told Caldwell that Defendant had taken his phone, but Caldwell stated Defendant was not with him. Demetrius continued to ask Caldwell for his phone and pointed Caldwell in the direction to which Defendant ran.
Caldwell ran towards Defendant and said, "D---, that's f---ed up, bro. You rob my people, bro." Defendant responded, "F--- this s---. It's cutthroat season. It's cutthroat season." Defendant refused to give Caldwell Demetrius's phone. Caldwell ran back to Demetrius and told Demetrius he was not getting his phone back. Demetrius, once again, accused Caldwell and Defendant, saying, "It's f---ed up. Y'all trying to rob us. That's f---ed up." Caldwell next saw Defendant two days later, on 16 August 2014. Caldwell admonished Defendant for "robbing people" and mentioned they might both get a warrant. On 20 August 2014, Caldwell and Defendant were arrested while together.
Caldwell also testified Defendant told him, approximately four days before the robbery, he was planning a robbery because he was diagnosed with HIV and needed the money.
Next, the State called Marc White. Marc's testimony regarding the early evening and drive to Little Rock Apartments matched Demetrius's testimony and statements to officers. After Marc parked his car at the apartment, the next thing he remembered was hearing "bells ringing." Marc "couldn't do a thing" and was in shock when he looked down and saw his shirt covered in blood. Marc then noticed Demetrius fighting Caldwell. Once Marc felt his head getting hit, he put his hand on his head.
Next, Marc got out of the car and fell to the ground. As he leaned up against his car, he saw someone standing over him. The person standing over him instructed Marc to take off his sneakers and pants and to give him Marc's money and wallet. Marc gave the man his Green Dot money card, cash, debit card, and cell phone. The man also asked for Marc's earrings, which Marc handed over. When asked to describe his attacker, Marc testified the man wore black pants, a white shirt, a doo-rag, and blue latex gloves. After Marc handed over his belongings, he saw his attacker and Caldwell run off together.
The State rested its case, and Defendant moved to dismiss all charges against him. The trial court denied Defendant's motion. However, the trial court did note it would revisit the conspiracy charges, if Defendant found case law holding the State could not charge Defendant with two conspiracies. The court then recessed until the next morning.
The next morning, on 8 October 2015, the trial court readdressed the issue of charging multiple conspiracies. The trial court dismissed one of the conspiracy charges (14 CRS 233419). The trial court reiterated its denial of Defendant's motion to dismiss the other charges. Defendant did not present any evidence. Defendant renewed his motion to dismiss the remaining charges against him. The trial court denied Defendant's renewed motion.
The jury found Defendant guilty of two counts of assault with a deadly weapon inflicting serious injury; two counts of robbery with a dangerous weapon; and conspiracy to commit robbery with a dangerous weapon. Defendant admitted to the existence of two aggravating factors. Prayer for judgment was continued until 26 October 2015.
On 26 October 2015, Defendant pled guilty to felony assault on a law enforcement officer inflicting physical injury. That same day, the trial court entered judgment. The trial court sentenced Defendant as a Level IV offender in the aggravated range for the two armed robbery convictions, resulting in two consecutive terms of 115 to 150 months imprisonment. The trial court consolidated the remaining convictions and sentenced Defendant to 48 to 70 months in prison, to run consecutively with the sentence for armed robbery. Defendant gave timely oral notice of appeal.
II. Standard of Review
First, regarding the motion to dismiss, "[t]his Court reviews the trial court's denial of a motion to dismiss de novo ." State v. Smith , 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007) (citation omitted). " 'Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied.' " State v. Fritsch , 351 N.C. 373, 378, 526 S.E.2d 451, 455 (2000) (citation and quotations omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." State v. Smith , 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980) (citations omitted).
Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence. If the evidence presented is circumstantial, the court must consider whether a reasonable inference of defendant's guilt may be drawn from the circumstances. Once the court decides that a reasonable inference of defendant's guilt may be drawn from the circumstances, then it is for the jury to decide whether the facts, taken singly or in combination, satisfy [it] beyond a reasonable doubt that the defendant is actually guilty.
Fritsch , 351 N.C. at 379, 526 S.E.2d at 455 (internal citations and quotation marks and italics omitted).
Second, in regards to the order of restitution, we review de novo whether the restitution order was supported by evidence adduced at trial or at sentencing. State v. Wright , 212 N.C. App. 640, 645, 711 S.E.2d 797, 801 (2011).
III. Analysis
A. Motion to Dismiss
Defendant argues the trial court erred by denying his motion to dismiss the charge of conspiracy to commit robbery with a dangerous weapon. He contends the State provided insufficient evidence of an agreement between Defendant and Caldwell prior to the robbery. Specifically, Defendant argues there is insufficient evidence to prove Caldwell agreed both to use of a dangerous weapon and to endanger or threaten the lives of the victims. We disagree.
"A criminal conspiracy is an agreement between two or more persons to do an unlawful act or to do a lawful act by unlawful means." State v. Lamb , 342 N.C. 151, 155, 463 S.E.2d 189, 191 (1995) (citation omitted).
Whether or not an agreement exists to support a finding of guilt in a conspiracy case is generally inferred from an analysis of the surrounding facts and circumstances, rather than established by direct proof. The mere fact that the crime the defendant allegedly conspired with others to commit took place does not, without more, prove the existence of a conspiracy. If the conspiracy is to be proved by inferences drawn by the evidence, such evidence must point unerringly to the existence of a conspiracy.
State v. Fleming , --- N.C. App. ----, ----, 786 S.E.2d 760, 766 (2016) (internal citations and quotation marks omitted).
In this case, the jury convicted Defendant of conspiracy to commit robbery with a dangerous weapon. The elements of said offense are: "(1) an unlawful taking or an attempt to take personal property from the person or in the presence of another, (2) by use or threatened use of a firearm or other dangerous weapon, (3) whereby the life of a person is endangered or threatened." State v. Call , 349 N.C. 382, 417, 508 S.E.2d 496, 518 (1998). Thus, in order to overcome Defendant's motion to dismiss, the State was required to present substantial evidence that Defendant and Caldwell agreed to commit each element of this offense. See Fleming , --- N.C. App. at ----, 786 S.E.2d at 766 (citations omitted).
Defendant argues Caldwell's testimony proves Caldwell and Defendant did not have an agreement to commit armed robbery. Defendant highlights the fact that a mere relationship between Defendant and Caldwell is insufficient to prove a conspiracy. See State v. Massey , 76 N.C. App. 660, 662, 334 S.E.2d 71, 72 (1985) (citation omitted) (holding conspiracy "cannot be established by a mere suspicion, nor does a mere relationship between the parties or association show a conspiracy.").
The evidence at trial, when taken in the light most favorable to the State, was sufficient to support a reasonable belief Defendant and Caldwell conspired to rob Marc and Demetrius. Caldwell testified Defendant told him four days before the robbery that he needed to get money "even if [he] got to rob somebody." Moreover, the jury heard testimony of Caldwell initiating the conversation with Demetrius, which led to Demetrius and Marc giving Defendant and Caldwell a ride. When they arrived at their purported destination, testimony suggested Defendant attacked Marc with a hammer and Caldwell attacked Demetrius with a box cutter, essentially simultaneously. Demetrius testified he saw Marc "being beaten on top of the head" and he "felt the cuts on the back of [his] neck...." While Demetrius and Caldwell fought outside the vehicle, Caldwell said, "we're just gonna grab what you've got and we're gonna get outta here." (emphasis added) Defendant took Marc's debit card, cell phone, cash, and earrings, while Caldwell took Demetrius's phone. Defendant and Caldwell then fled the scene together, continued to hang out together after the robberies, and were eventually arrested together almost a week after the robbery.
Considering all of this evidence, there is sufficient evidence to support a reasonable belief that Defendant and Caldwell agreed to engage in armed robbery. Moreover, the evidence tended to prove more than just a mere relationship between the parties. As a result, the trial court properly denied Defendant's motion to dismiss the conspiracy charge.
B. Restitution
Defendant argues the trial court erred by imposing $22,144.50 in restitution without considering his financial circumstances or his ability to pay. We disagree.
Initially, we note although Defendant did not object to the trial court's restitution award, "no objection is required to preserve for appellate review issues concerning the imposition of restitution." State v. Smith , 210 N.C. App. 439, 443, 707 S.E.2d 779, 782 (2011) (citation omitted).
North Carolina General Statute section 15A-1340.36 states:
In determining the amount of restitution to be made, the court shall take into consideration the resources of the defendant including all real and personal property owned by the defendant and the income derived from the property, the defendant's ability to earn, the defendant's obligation to support dependents, and any other matters that pertain to the defendant's ability to make restitution, but the court is not required to make findings of fact or conclusions of law on these matters. The amount of restitution must be limited to that supported by the record, and the court may order partial restitution when it appears that the damage or loss caused by the offense is greater than that which the defendant is able to pay. If the court orders partial restitution, the court shall state on the record the reasons for such an order.
N.C. Gen. Stat. § 15A-1340.36(a). The statute does not require the trial court to enter written findings of fact regarding its award of restitution, but does "require[ ] the court to take into consideration the resources of the defendant, [his] ability to earn, [his] obligation to support dependents, and such other matters as shall pertain to [his] ability to make restitution or reparation." State v. Minton , 223 N.C. App. 319, 324, 734 S.E.2d 608, 611 (2012) (quoting State v. Hunter , 315 N.C. 371, 376, 338 S.E.2d 99, 103 (1986) ). However, "[i]ssues at a sentencing hearing may be established by stipulation of counsel if that stipulation is definite and certain." State v. Mumford , 364 N.C. 394, 403, 699 S.E.2d 911, 917 (2010) (citations and quotation marks omitted).
In this case, the parties and the trial court engaged in the following colloquy regarding restitution:
[The State]: Couple other things. Marc White, the victim, is present in the courtroom. He said he did not wish to make any statements to the Court. The State is requesting on his behalf $22,144.50 restitution. That's only for his medical bills.
[The Court]: [Defense counsel], does your client stipulate to those numbers?
[Defense counsel]: After speaking with my client, he does stipulate.
Defendant contends he only stipulated to the "amount of the medical bills thereby indicating that there was no need to prove up those bills" and he did not stipulate to the imposition of restitution itself. The State contends Defendant's stipulation was definite and certain.
Defendant's statement was a "definite and certain" stipulation to the amount of restitution, which is sufficient to support the trial court's award. Id. at 403-04, 699 S.E.2d at 917 (citations omitted). In the colloquy, the State requested $22,144.50 in restitution for Marc White, and stated this amount was for White's medical bills. Then, Defendant's counsel stipulated to those numbers. There was no confusion regarding these numbers during this colloquy, distinguishing this case from Mumford. Id. at 403-04, 699 S.E.2d at 917 (holding a stipulation was not definite and certain when there was confusion whether insurance payments had been included in the restitution worksheets and the confusion cast doubt on the certainty of the Defendant's stipulation). We do not have the same doubt the Mumford court had regarding the stipulation.
Moreover, when Defendant stipulated to restitution, he did not argue he lacked the ability to pay the stipulated amount, and thus, the trial court did not err to the extent it did not consider this factor. See State v. Riley , 167 N.C. App. 346, 349, 605 S.E.2d 212, 215 (2004) ("Because [Defendant] failed to present evidence showing that she would not be able to make the required restitution payments, we find no error."). Defendant's argument is overruled.
IV. Conclusion
For the foregoing reasons, we hold Defendant received a fair trial, free from error.
NO ERROR.
Report per Rule 30(e).
Judges BRYANT and DIETZ concur.

At the time of the incident, the apartment complex was named "Old Boulevard." However, at the time of trial, the apartment complex was named "New Renaissance."