HUNTER, JR., Robert N., Judge.
 

 *265
 
 Charles T. Mathis ("Defendant") appeals following jury verdicts convicting him of obtaining property by false pretenses, falsification of monthly bail bond report information, and unlawfully accessing a government computer. On appeal, Defendant brings forth the following arguments: (1) the indictment charging him for unlawfully accessing a government computer was fatally defective; (2) the trial court erred in denying his motion to dismiss the unlawfully accessing a government computer charge; (3) the indictments for unlawfully accessing a government computer and obtaining property by false pretenses infringe his constitutional right to avoid double jeopardy; (4) the trial court erred in denying his motion to dismiss the falsifying bail bond report information and obtaining property by false pretenses charges; and (5) the State violated his constitutional right of equal protection by selectively prosecuting him. We find no error in part, dismiss in part, reverse in part, and remand for resentencing.
 

 I. Factual and Procedural Background
 

 On 1 June 2015, a Union County Grand Jury indicted Defendant for unlawfully accessing a government computer, falsification of bail bond report information, and obtaining property by false pretenses. On 6 July 2015, Defendant waived his right to counsel, opting to proceed
 
 pro se
 
 .
 

 On 2 July 2017, the court called Defendant's case for trial. Through a series of four witnesses, the State began its case introducing court records of Defendant's bonds, the Department of Insurance's procedures and requirements for licensing of bail bondsmen, and Defendant's bank accounts, which showed delinquencies.
 

 The State first called Catherine Morrison, Clerk of the Union County Superior Court. Morrison maintains the bail bond records of the criminal division of court. Through her testimony, Morrison identified and the State introduced into evidence twenty-four bond forfeiture notices signed by Defendant. Of the twenty-four bonds the State introduced, eighteen bonds are listed in the indictments for unlawfully accessing a government computer and falsification of monthly bail bond report information. Six other bonds are only listed in the indictment for the falsification of monthly bail bond report information. For twelve of the bonds listed in both indictments, Defendant received $3,225 in premium fees. Defendant received the following amounts: (1) $500 for Jonathan Sheppard's bond; (2) $100 for Joshua Newton's bond; (3) $400 for James Massey's bond; (4) $375 for Ronnie Marble's bond;
 

 *266
 
 (5) $100 for one of
 
 *631
 
 Justin Maldonado's bonds;
 
 [1]
 
 (6) $100 for another one of Justin Maldonado's bonds; (7) $300 for Dennis Knox's bond; (8) $75 for Xandria Harris's bond; (9) $200 for Elizabeth Greene's bond; (10) $75 for Cortez Grace's bond; (11) $800 for Tammy Evans's bond; and (12) $200 for Tyrone Alsbrooks's bond. This testimony established the funds Defendant received during this period of time, which includes bonds he should have listed in his daily logs and monthly reports, as explained hereafter.
 

 The State then called Frank Bradley, an employee of U.S. Bank National Association ("U.S. Bank"). U.S. Bank maintains Defendant's security account required by the North Carolina's bail bondsman program, see discussion
 
 infra
 
 . Bank records introduced through Bradley show Defendant's bank accounts had the following funds deposited: (1) on 31 December 2008, $22,173.67; (2) on 31 December 2009, $22,040; (3) from 1 January 2010 to 31 December 2010, $21,960; (4) on 31 December 2011, $21,800; (5) on 31 December 2012, $21,800; (6) on 31 December 2013, $21,800; and (7) in June 2014, $21,800. On 2 December 2014, Defendant deposited $178,300. On 31 December 2014, Defendant's account held a cash on hand balance of $200,100. These funds establish the dollar amount of individual bonds Defendant could issue under Department of Insurance regulations, as explained
 
 infra
 
 .
 

 The State next called Keisha Burch, a complaint analyst in the Bail Bond Regulatory Division of the Department of Insurance, for the purpose of explaining the process of becoming a licensed bail bondsman.
 
 [2]
 
 Burch explained an applicant must take a pre-licensing bond course and pass the course's examination. If successful, an applicant then applies for a State license and is investigated to establish his qualifications. Once qualified, the Department of Insurance sends him a letter, authorizing him to take a State administered examination. In the event the applicant passes, the applicant is required to deposit a minimum amount of
 
 *267
 
 $15,000 in a security account (similar to the one Defendant established at U.S. Bank). The security account allows the Department of Insurance to match the funds deposited to the amount of bonds written.
 

 Next, Burch explained the process of license renewal. Bondsmen hold licenses for one year. Before the annual expiration date, the Department of Insurance sends bail bondsmen a notice of renewal. To be renewed, a bondsman must complete the paperwork before the deadline, pay renewal fees, and complete required continuing education. If renewed, the bondsman does not obtain a new license, but retains his existing license for another year. As long as a bondsman properly renews his license, he continuously holds his license through successive renewal periods.
 

 In the event a lapse occurs in the license for non-renewal, the bondsman is required to reapply. Upon reapplication, the bondsman would receive a new license, but not a new license number.
 

 All bondsmen have to retain a security deposit fund in a special security account, which "is an account that [the Department of Insurance has] for the professional bail bondsman to deposit money." The amount on deposit regulates both the dollar amount of any individual bond a bondsman can issue and the total aggregate dollar amount of bonds a bondsman can issue in two ways.
 

 The Department of Insurance's rules are known as the "one quarter rule" and the "eight times rule[.]" Under the one quarter rule, the bondsman cannot write bonds for more than one quarter of the deposit amount
 
 *632
 
 for any single individual. Under the eight times rule, the bondsman can, in the aggregate, only write bonds equal to a sum of eight times the amount deposited in the account. Several witnesses illustrated the rules as follows. First, under the one quarter rule: (1) if a bondsman had a $20,000 deposit, the largest amount of a bond he could write for one individual would be a $5,000 bond; or (2) with a $15,000 deposit, he could write a $3,750 bond for one individual. Under the eight times rule, with a $20,000 deposit, the bondsman could write up to $160,000 in bonds.
 

 To document bonds written against the security deposit on hand, bondsmen are legally required to keep monthly reports of the bonds they issue. Monthly reports are "reports that are sent in by the professional bondsman only of all of the bonds that they have written that are currently outstanding[,]" as of the fifteenth of the month. Bondsmen are required to file the monthly reports with the Department of Insurance.
 

 *268
 
 Burch identified and the State introduced the Department of Insurance's "demographic record" for Defendant.
 
 [3]
 
 The demographic record showed the following. Defendant first became licensed on 26 February 1998. At the time of trial, Defendant held an active professional bail bond license, surety bail bond license, and bail runner license.
 

 The State introduced Defendant's monthly reports from December 2008 to July 2014. On the bottom of each monthly report, Defendant signed an attestation clause, certifying he was "submitting a true and accurate report."
 

 On 11 April 2013, Burch sent Defendant a notice of deficiency. The letter stated the Department of Insurance reviewed Defendant's March 2013 report and determined the amount in his security deposit was deficient. On 24 November 2014, the Department of Insurance sent Defendant another notice of deficiency. In response to the notice, Defendant cured the deficiency by depositing $178,200 in his security account.
 

 The State next called Steve Bryant, a senior complaint analyst in the Bail Bond Regulatory Division of the Department of Insurance. Bryant sent Defendant the 24 November 2014 notice of deficiency. The notice indicated the Department of Insurance received information Defendant omitted bonds in his monthly reports.
 
 [4]
 
 The notice also asserted Defendant exceeded both the one quarter and eight times rules for two individuals' bonds, Randall Shehane and Martin Cavanaugh.
 
 [5]
 
 Defendant wrote Shehane a $50,000 bond and Cavanaugh a $10,000 bond. At the time he wrote those two bonds, Defendant maintained a $21,800 deposit in his security account. This created a deficiency under the one quarter rule, because with $21,800 on deposit, Defendant could only write bonds up to $5,450 per individual (Burch's testimony indicated Defendant cured this deficiency).
 
 [6]
 

 After Bryant's direct examination, Defendant cross examined Bryant in support of his theory of selective prosecution. Bryant testified he
 
 *269
 
 spoke with Timothy Pardeau, a criminal investigator. Bryant "referred" certain documents to the Criminal Investigations Division.
 

 Defendant asked the following:
 

 Q. And how many professional bondsmen have you investigated for this type of alleged activity?
 

 A. I don't have an exact count.
 

 Q. Could you give us a general idea, 10, 50, 100?
 

 A. It's approximately 20, if I were to take a guess.
 

 Q. And out of those 20,-out of those 20, how many of those have you ever criminally charged with violations?
 

 A. I don't have authority to criminally charge anybody.
 

 *633
 
 Q. How many of those 20 have you ever known to be criminally charged for those violations?
 

 A. Again, that would be a question for the Criminal Investigations Division. I don't have-I'm not a sworn officer, I cannot-I don't have privy to that information.
 

 Q. Do you know of any criminal investigations that have been from the 20 people that you investigated alleged complaint?
 

 A. I know you as one of them and I believe your brother Robert Mathis was also charged.
 

 Q. Would one of the other ones be a Roland Loftin?
 

 A. Again, I don't know if he was charged. That again would be a question for Criminal Investigations Division.
 

 Q. Other than me and my brother, do you know of or have you heard of any other professional bondsman that has ever been charged with a criminal charge concerning monthly reports and reporting issues by one of these 20 people?
 

 A. I don't recall anybody informing me of that.
 

 Q. So your answer is that nobody has been charged that you know of other than me and my brother?
 

 A. I'm not aware of it.
 

 *270
 
 The State called Timothy Pardeau, an investigator in the Criminal Investigations Division of the Department of Insurance. In 2014,
 
 [7]
 
 Pardeau's supervisor assigned him Defendant's case, which was based on "an allegation that there was some bonds that were written by [Defendant] that were not reported on the monthly reports." In the beginning of his investigation, Pardeau contacted the Agent Services Division for access to Defendant's monthly reports. Pardeau collected bonds Defendant wrote from the Clerk of Court's office. Pardeau reviewed the bonds and monthly reports to determine if any bonds were missing from the reports.
 

 Pardeau "discovered that there was numerous bonds that had been written by [Defendant] under his professional license utilizing the seals that had not been reported on his monthly reports to Agent Services Division." The State introduced, without objection, an excel spreadsheet Pardeau created as part of his investigation. The spreadsheet showed twenty-four bonds missing from Defendant's monthly reports, from 2008 to 2014. These were the twenty-four bonds admitted during Morrison's testimony and included in the unlawfully accessing a government computer and falsification of monthly bail bond report information indictments. Defendant omitted two bonds from only one monthly report. However, Defendant failed to include another bond, for $40,000, in thirty-one monthly reports: (1) December 2008; (2) January, February, March, April, May, October, November, and December 2009; (3) January, February, March, May, June, July, September, November, and December 2010; (4) March, April, May, June, July, August, September, October, November, and December 2011; and (5) January, February, and April 2012. The highest balance Defendant had during those five years was $22,173.67. Under the one quarter rule, Defendant could only write a $5,543.42 bond.
 

 Our examination of the spreadsheet and testimony shows the following. As an example of how Defendant profited from withholding information, in 2011, Defendant kept a $21,800 balance in his security account. Under the one quarter rule, Defendant could write only a $5,450 bond. Pardeau found four bonds-in the amounts of $10,000, $10,000, $40,000, and $50,000-not included in the monthly reports during 2011. For one of the $10,000 bonds, Defendant received $800 in bond premium. Defendant did not earn any bond premium on the other $10,000 bond or the $40,000 and $50,000 bonds. However, to issue a
 
 *271
 
 $50,000 bond, Defendant would need $200,000 deposited in his security account, $178,200 more than his deposit amount in 2011. Also, in 2011 and 2012, Defendant omitted a $10,000 bond for defendant Alsbrooks. Due to his account balance in 2011 and 2012, Defendant could only issue bonds in the amount of $5,450 and still comply with the one quarter rule. Defendant earned $200 in bond premium for the Alsbrooks's bond.
 
 *634
 
 When asked how Defendant obtained property by false pretenses, Pardeau explained:
 

 The basis of my obtaining property by false pretense was the fact that you submitted an application for a bail bonding license. Had they known that fraud was being committed or monthly reports were being falsely submitted, my assumption would be that they would not have given you a license because that's a felony in the State of North Carolina, convicted felons are not allowed to hold bail bonding licenses.
 

 Defendant asked Pardeau if he could testify he knew Defendant "physically, personally generated and submitted to the SBS system[.]" Pardeau answered:
 

 I can only testify as to what I just said, sir, that your user name and password was utilized to access the State system and that your e-mail was utilized to submit these reports and that your signature was on the bottom of some of these reports, or many of these reports, not all.
 

 Additionally, some reports were sent from Defendant's email.
 
 [8]
 

 The State rested.
 
 [9]
 
 Defendant moved to dismiss all the charges. The trial court denied Defendant's motion.
 

 Defendant called Wayne Goodwin, the former Commissioner of the Department of Insurance. When Defendant began to question Goodwin about his relationships with members of the North Carolina Bail Agent's Association, the State objected on relevance grounds. Defendant argued Goodwin's testimony would show he "was in office when these charges were brought [and] will show that he was working as the Department to get rid of me and the company that I work with[.]" Defendant also
 
 *272
 
 asserted Goodwin's testimony would show he selectively enforced the laws against Defendant.
 

 The court allowed Defendant to make a proffer. After Defendant asked Goodwin six additional questions, the court stated it was "having ... difficulty finding how this is at all relevant to anything." The court asked Defendant to "please get to something that ... is relevant to the issues that are being tried[,]" and said, "if [Defendant] wish[ed] to ask him some questions that would make this relevant, [it]'d be happy to consider it[.]" Defendant responded, "without going through a bit more I would just say I'm good with that and I'll be done with this witness." The court asked Defendant if he wished to be heard on the issue of relevancy. Defendant requested he be allowed to ask one more question. The court agreed to one more question. The court allowed Defendant to ask six more questions, and Defendant ended his proffer.
 

 Defendant called Rebecca Shigley, a former deputy commissioner of the Agent Services Division of the Department of Insurance. Shigley investigated a complaint about Defendant, which Phillip Bradshaw, a licensed bail bondsman on the board of the North Carolina Bail Agent's Association, sent. After receiving the complaint, Shigley referred the matter over to the Criminal Investigations Division. During Shigley's investigation, she met with Defendant, along with an attorney from the Department of Justice. At the meeting, Defendant asserted the issues in his monthly reports arose from the person submitting the reports omitting the last three lines of the report.
 

 The following questioning occurred:
 

 Q. Ms. Shigley, to your knowledge how many professional bail bondsman have ever been charged for clerical errors on monthly reports?
 

 A. I do not know.
 

 Q. During your tenure do you have any idea?
 

 A. I do not know.
 

 Q. Are you appri[s]ed of the people that are charged once y'all-if the investigation is done?
 

 ...
 

 A. I'm sorry. Agent Services Division does not handle any criminal matters. If when
 
 *635
 
 we are reviewing a complaint we find that there are-possibly are criminal violations,
 
 *273
 
 we refer it over to the Criminal Investigations Division and they generally do not appri[s]e us of the case after that.
 

 Q. And so when you get a complaint that could possibly be a felony charge or a criminal violation, the ASD doesn't investigate that, they send that to the CID; correct?
 

 A. That's correct, that's our procedure.
 

 Q. And under your senior tenure as the deputy, was it your policy that any investigation that was done on a criminal activity be done through the Criminal Investigative Division for a criminal offense?
 

 A. It was our policy that as we were reviewing a complaint if there was an administrative complaint the Agent Services Division would handle it and if part of the complaint or the whole complaint was a criminal-possible criminal matter, we referred it to the Criminal Investigations Division to handle as they deem appropriate.
 

 When asked how many bondsman she knew the State criminally charged for violation of the reporting laws, Shigley answered, "We handle administrative things so I'm not always aware of the criminal charges, but I do know that there were two bail bondsman that were charged criminally based on bail bondsman monthly reports." Those two people were Defendant and his brother. However, Shigley did "know of several professional bail bondsman that had additionally regulatory action taken against their bail bondsman license and there several complaints" during her time in the Agent Services Division.
 

 Defendant rested and renewed his motion to dismiss. The trial court denied Defendant's motion.
 

 During deliberations, the jury asked the court to define property. The State asserted "it's pretty clear the property that is referred to in the indictment is the bail bondsman's license." The jury returned to the courtroom, and the court instructed, "property is not defined in the statute and ... we ask that you use your good judgment and common sense at arriving at your understanding of what the term property means." The jury found Defendant guilty of obtaining property by false pretenses, falsification of monthly bail bond report information, and unlawfully accessing a government computer. The court consolidated the offenses and sentenced Defendant to 13 to 25 months imprisonment. Defendant gave oral notice of appeal.
 

 *274
 

 II. Standard of Review
 

 We review the sufficiency of an indictment for subject matter jurisdiction, Defendant's double jeopardy argument, and his claim of selective prosecution
 
 de novo
 
 .
 
 State v. Collins
 
 ,
 
 221 N.C. App. 604
 
 , 610,
 
 727 S.E.2d 922
 
 , 926 (2012) (citation omitted) (reviewing an indictment
 
 de novo
 
 );
 
 State v. Graham
 
 ,
 
 200 N.C. App. 204
 
 , 214,
 
 683 S.E.2d 437
 
 , 444 (2009) (citation omitted) (reviewing constitutional claims
 
 de novo
 
 ).
 

 We also review motions to dismiss
 
 de novo
 
 .
 
 State v. Smith
 
 ,
 
 186 N.C. App. 57
 
 , 62,
 
 650 S.E.2d 29
 
 , 33 (2007) (citation omitted). " 'Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied.' "
 
 State v. Fritsch
 
 ,
 
 351 N.C. 373
 
 , 378,
 
 526 S.E.2d 451
 
 , 455 (2000) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
 
 State v. Smith
 
 ,
 
 300 N.C. 71
 
 , 78-79,
 
 265 S.E.2d 164
 
 , 169 (1980) (citations omitted).
 

 Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence. If the evidence presented is circumstantial, the court must consider whether a reasonable inference of defendant's guilt may be drawn from the circumstances. Once the court decides that a reasonable inference of defendant's guilt may be drawn from the circumstances, then it is for the jury to decide whether the facts, taken singly or in combination, satisfy [it] beyond a reasonable doubt that the defendant is actually guilty.
 

 *636
 

 Fritsch
 
 ,
 
 351 N.C. at 379
 
 ,
 
 526 S.E.2d at 455
 
 (internal citations, quotation marks, and italics omitted) (alteration in original).
 

 III. Analysis
 

 Defendant brings forth the following arguments: (1) the indictment charging him for unlawfully accessing a government computer was fatally defective; (2) the trial court erred in denying his motion to dismiss the accessing a government computer charge; (3) the State violated his constitutional right against double jeopardy; (4) the trial court erred in denying his motion to dismiss the falsifying monthly bail bond report information charge; (5) the trial court erred in denying his motion to dismiss the obtaining property by false pretenses charge; and (6) the
 
 *275
 
 State violated his constitutional right of equal protection by selectively prosecuting him. We address these arguments in turn.
 

 A. Validity of the Indictment
 

 Defendant first argues the indictment failed to sufficiently allege the essential elements of the crime. Specifically, Defendant alleges his acts were not willful or with criminal intent because the Department of Insurance required him to submit monthly reports.
 

 The State charged Defendant for violation of
 
 N.C. Gen. Stat. § 14-454.1
 
 , which states:
 

 (a) It is unlawful to willfully, directly or indirectly, access or cause to be accessed any government computer for the purpose of:
 

 (1) Devising or executing any scheme or artifice to defraud, or
 

 (2) Obtaining property or services by means of false or fraudulent pretenses, representations, or promises.
 

 A violation of this subsection is a Class F felony.
 

 (b) Any person who willfully and without authorization, directly or indirectly, accesses or causes to be accessed any government computer for any purpose other than those set forth in subsection (a) of this section is guilty of a Class H felony.
 

 N.C. Gen. Stat. § 14-454.1
 
 (a) - (b) (2017).
 

 A valid indictment must contain:
 

 (1) the identification of the defendant; (2) a "separate count addressed to each offense charged"; (3) the county in which the offense took place; (4) the date, or range of dates, during which the offense was committed; (5) a "plain and concise factual statement in each count" that supports every element of the offense and the defendant's commission thereof; and (6) the "applicable statute, rule, regulation, ordinance, or other provision of law alleged therein to have been violated.
 

 State v. Golder
 
 , --- N.C. App. ----, ----,
 
 809 S.E.2d 502
 
 , 505-06 (2018) (citing N.C. Gen. Stat. § 15A-924(a)(1)-(6) (2017) ). "As a general rule, an indictment couched in the language of the statute is sufficient to charge
 
 *276
 
 the statutory offense."
 

 Id.
 

 at ----,
 
 809 S.E.2d at 506
 
 (quotation marks and citation omitted).
 

 The substantive portion of the indictment at issue reads:
 

 The jurors for the State upon their oath present that on or about the date(s) of offense shown and in the county named above the defendant named above unlawfully, willfully and feloniously did access by means of inputting information as part of required monthly reports on outstanding bond obligations under N.C.G.S. 58-71-165 the government computer system operated and maintained by the North Carolina Department of Insurance (a State Government entity) in order to commit fraud. Specifically the defendant entered and submitted information falsely by withholding specific bond liabilities outstanding in the following defendants' criminal matters: [ (listed fourteen defendants) ]. These bonds were withheld while submitting as an accurate accounting other bond obligations, and thus falsely represented his total amount of outstanding liability. This was done for the purpose of obtaining property-a professional bail bondsman's license-as well as money and fees (premiums) charged in connection with the bonding of individuals, which was done under the Defendant's professional bonding license, as well as to maintain a lower balance in the monthly required securities
 
 *637
 
 account maintained according to the North Carolina General Statutes.
 

 Defendant contends the State failed to prove willfulness because the State compels Defendant to keep monthly bail bond reports. Defendant contends if the State compelled him to complete and submit monthly reports, then his inadvertent failure to accurately report his transactions cannot be considered intentional. This argument has no bearing on the validity of the indictment and is addressed
 
 infra
 
 .
 
 [10]
 

 B. Motion to Dismiss Accessing A Government Computer Charge
 

 Next, Defendant argues the court erred in denying his motion to dismiss his charges under
 
 N.C. Gen. Stat. § 14-454.1
 
 . Defendant brings
 
 *277
 
 forth the following issues: (1) whether his actions meet the definition of willful
 
 [11]
 
 or "without authorization"; and (2) whether his actions constituted accessing or causing to be accessed a government computer.
 

 1. Willful or Without Authorization
 

 First, we address willfulness and without authorization. Our review of the plain language of the statute shows the subsection under which the State charged Defendant, included
 
 supra
 
 , does not include the words "without authorization."
 

 For computer-related crimes, our General Assembly defines "Authorization" as: "having the consent or permission of the owner, or of the person licensed or authorized by the owner to grant consent or permission to access ... not exceeding the consent or permission."
 
 N.C. Gen. Stat. § 14-453
 
 (1a) (2017). When our Supreme Court reviewed willfulness for another computer-related crime, it applied the traditional definition of willful and not the definition of "authorization" in
 
 N.C. Gen. Stat. § 14-453
 
 (1a).
 
 State v. Ramos
 
 ,
 
 363 N.C. 352
 
 , 355,
 
 678 S.E.2d 224
 
 , 226 (2009) (citation omitted). Additionally, this Court has both included the definition of "authorization" in its analysis of willful and has omitted the definition and only required the State to produce substantial evidence of the traditional definition of willful.
 
 Compare
 

 State v. Johnston
 
 ,
 
 173 N.C. App. 334
 
 ,
 
 618 S.E.2d 807
 
 (2005) (using the "authorization" definition),
 
 with
 

 State v. Ramos
 
 ,
 
 193 N.C. App. 629
 
 ,
 
 668 S.E.2d 357
 
 (2008),
 
 aff'd,
 

 363 N.C. 352
 
 ,
 
 678 S.E.2d 224
 
 (2009) (distinguishing the traditional definition of willful and the definition of authorization). We note the terms "without authorization" and "willfulness" do not fully encompass each other. Indeed, when a defendant challenged jury instructions which only included the definition of "without authorization" but not the definition of "willfulness", this Court stated "[o]ne may act 'without authorization,' but still not act willfully."
 
 Ramos
 
 ,
 
 193 N.C. App. at 636
 
 ,
 
 668 S.E.2d at 363
 
 .
 

 Unlike
 
 N.C. Gen. Stat. § 14-454.1
 
 (b) and (c), which both include the words "willfully" and "without authorization", subsection (a) only requires "willful[ ]" action.
 
 N.C. Gen. Stat. § 14-454.1
 
 (a) - (c).
 
 [12]
 
 However,
 
 *278
 
 our Court read the "without authorization" requirement into the definition of "willful" for this very subsection in
 
 State v. Barr
 
 ,
 
 218 N.C. App. 329
 
 ,
 
 721 S.E.2d 395
 
 (2012).
 

 In
 
 Barr
 
 , the defendant brought forth the same argument asserted in the case
 
 sub judice
 
 -whether her actions were willful. Barr owned and operated Lexington License Plate Agency and worked as a title clerk.
 
 Id.
 
 at 331,
 
 721 S.E.2d at 397-98
 
 . After the sale of a vehicle, a car dealer transfers title by delivering the paperwork to a license plate agency.
 
 Id.
 
 at 331,
 
 721 S.E.2d at 398
 
 . At the agency, a title clerk checks the paperwork and "accesses a computer system called State Title and Registration System ('STARS')" to enter in the title clerk's "unique" number and a password.
 
 Id.
 
 at 331,
 
 721 S.E.2d at 398
 
 . After a title clerk enters the information for
 
 *638
 
 a transfer, the title clerk can process the transfer of title.
 
 Id.
 
 at 331,
 
 721 S.E.2d at 398
 
 .
 

 Barr transferred titles for Lanier Motor Company; however, in 2008, Lanier lost its license and continued to sell vehicles without a license.
 
 Id.
 
 at 332,
 
 721 S.E.2d at 398
 
 . When another title clerk tried to enter Lanier's dealer identification number into STARS, the computer noted the number was invalid.
 
 Id.
 
 at 332,
 
 721 S.E.2d at 398
 
 . The clerk entered "OS" into the system, indicating the dealer was an out-of-state dealer.
 
 Id.
 
 at 332,
 
 721 S.E.2d at 398
 
 . There was conflicting evidence if Barr herself instructed others to enter OS, or if someone from the DMV instructed Barr to input OS.
 
 Id.
 
 at 332,
 
 721 S.E.2d at 398
 
 . One witness testified when he told Barr that Lanier's dealer number was inactive, Barr replied "to go ahead and process it an as O S[.]"
 
 Id.
 
 at 339,
 
 721 S.E.2d at 402
 
 .
 

 A jury convicted Barr of three counts of unlawfully accessing a government computer for a fraudulent purpose and two counts of aiding and abetting the unlawful access of a government computer.
 
 Id.
 
 at 333,
 
 721 S.E.2d at 399
 
 . On appeal, Barr argued the State did not introduce substantial evidence of willfulness because evidence showed she believed a DMV worker instructed her to input certain information into the government computer. Our Court concluded, taken in the light most favorable to the State, the State presented substantial evidence of Barr's willfulness to violate
 
 N.C. Gen. Stat. § 14-454.1
 
 (a)(2), because the testimony showed Barr acted "purposely and deliberately, indicating a purpose to do it without authority-careless whether [s]he has the right or not-in violation of the law[.]"
 

 Id.
 

 at 340
 
 ,
 
 721 S.E.2d at 403
 
 (citation and quotation marks omitted) (second alteration in original).
 

 To our Court, it is telling in
 
 Barr
 
 , defendant had authorization to utilize and access STARS. However, she did
 
 not
 
 have authorization
 
 *279
 
 to input the fraudulent information she inputted-to transfer title for an unlicensed in-state dealer and label the transfer as one for an out-of-state dealer. Similarly, here, Defendant had the authorization to use the SBS system. However, Defendant exceeded that authorization by inputting fraudulent information. The State submitted substantial evidence of Defendant inputting fraudulent information into the SBS system and the willfulness of his actions. Defendant's argument lacks merit.
 

 2. Accessing a Government Computer
 

 Second, "Access" is defined as "to instruct, communicate with, cause input, cause output, cause data processing, or otherwise make use of any resources of a computer, computer system, or computer network."
 
 N.C. Gen. Stat. § 14-453
 
 (1). The unlawfully accessing a government computer statute includes both direct and indirect access of a government computer.
 
 N.C. Gen. Stat. § 14-454.1
 
 (a).
 

 Defendant asserts "sending information by SBS or e-mail does not" meet the definition of access, as he merely transmitted information, which the Department of Insurance's personnel actually uploaded into the system. While Defendant contends he did not personally access a government computer, he also states he "submitted information as required by the Department of Insurance using the computer system...."
 

 We conclude the State presented substantial evidence Defendant accessed, or caused another to access, a government computer. The SBS database qualifies as such a government program, and, thus, any access is access of a "government computer." Pardeau testified although he could not know Defendant "physically, personally" submitted information to the SBS system, there is substantial circumstantial evidence to withstand Defendant's motion to dismiss. To upload the monthly reports, a unique user name and password must be used, and Defendant's unique user name and password were used to access SBS. Additionally, Defendant's email "was utilized" to submit the reports, which Defendant signed. Even if we were to accept Defendant's argument he only transmitted information then uploaded by the Department of Insurance's personnel, the statute not only covers accessing, but also if Defendant caused the government computer "to be accessed[.]"
 
 N.C. Gen. Stat. § 14-454.1
 
 (a). Thus, his argument is unavailing.
 
 [13]
 

 *639
 

 *280
 
 Finally, at oral argument, Defendant contended the intent of the statute could not be the mere submission of information. He argued the General Assembly wanted actual interaction with a government computer. However, the plain language, with the inclusive language of "access or cause to be accessed" and "directly or indirectly" dispel Defendant's contention. Accordingly, we hold the trial court did not err in denying Defendant's motion to dismiss the accessing a government computer charge.
 
 [14]
 

 C. Double Jeopardy
 

 On appeal, Defendant argues the State violated his right against double jeopardy by charging him for both obtaining property by false pretenses and accessing a government computer.
 

 "Constitutional questions not raised and passed on by the trial court will not ordinarily be considered on appeal."
 
 State v. Tirado
 
 ,
 
 358 N.C. 551
 
 , 571,
 
 599 S.E.2d 515
 
 , 529 (2004). Rule 10 (a)(1) requires Defendant to make "a timely request, objection, or motion, stating
 
 the specific grounds
 
 for the ruling the party desired the court to make[.]" N.C. R. App. P. 10 (a)(1) (2017) (emphasis added).
 

 Our review of the record shows Defendant failed to bring forth this argument at the trial level. While Defendant argued some of the crimes charged violated his right against double jeopardy, he based his arguments on the civil action revoking his licenses, which arose from the same actions giving rise to the criminal charges. Defendant brought forth no argument about a lesser included offense to the trial court. Consequently, the trial court could not make a determination on whether the crime of obtaining property by false pretenses is a lesser included offense of accessing a government computer for unlawful purposes. Accordingly, Defendant failed to preserve this argument for appellate review, and we dismiss this argument.
 

 D. Falsifying Monthly Bail Bond Report Information Charge
 

 Defendant next contends the State failed to present sufficient evidence he violated
 
 N.C. Gen. Stat. § 58-71-165
 
 (2017) and, thus, the court
 
 *281
 
 erred in denying his motion to dismiss. He contends the missing information in the reports, as alleged, "strongly suggests these omissions were clerical errors committed by [his] staff."
 

 We conclude the State presented substantial evidence to withstand Defendant's motion to dismiss this charge. The State presented evidence of the false reports, Defendant signing the attestation clause certifying he submitted true information, and the reports being filed via the SBS system. The question of fact-whether the omissions were fraud or clerical errors-was one to be determined by the jury. Accordingly, we hold the trial court did not err in denying Defendant's motion to dismiss this charge.
 

 E. Obtaining Property by False Pretenses Charge
 

 On appeal, Defendant argues the State failed to submit sufficient evidence of "causation" between the false representation and the obtaining of something of value. Defendant's argument is two-fold. First, he contends the only evidence of causation is the testimony from the State's witness, Timothy Pardeau. He argues this evidence, alone, is insufficient to show he "had a motive, plan or scheme which was intended to enable him to obtain a bail bond license which he already held." Second, Defendant argues he did not
 
 *640
 

 obtain
 
 anything of value, as he already had a bondsman license.
 

 N.C. Gen. Stat. § 14-100
 
 states:
 

 If any person shall knowingly and designedly by means of any kind of false pretense whatsoever, whether the false pretense is of a past or subsisting fact or of a future fulfillment or event, obtain or attempt to obtain from any person within this State any money, goods, property, services, chose in action, or other thing of value with intent to cheat or defraud any person of such money, goods, property, services, chose in action or other thing of value, such person shall be guilty of a felony....
 

 N.C. Gen. Stat. § 14-100
 
 (a) (2017).
 

 Black's Law Dictionary defines "obtain" as,
 
 inter alia
 
 , "To bring into one's own possession; to procure...."
 
 Black's Law Dictionary
 
 1247 (10th ed. 2014). Black's defines "retain" as,
 
 inter alia
 
 , "To hold in possession or under control; to keep and not lose, part with, or dismiss."
 

 Id.
 

 at 1509
 
 . Additionally, Webster's defines "obtain" as,
 
 inter alia
 
 , "to get possession of, esp. by some effort; procure[.]"
 
 Merriam Webster's New
 

 *282
 

 World College Dictionary
 
 1010 (5th ed. 2014). Webster's defines "retain" as,
 
 inter alia
 
 , "to hold or keep in possession" and "to continue to have or hold[.]"
 
 [15]
 

 Id.
 

 at 1240
 
 .
 

 The indictment for obtaining property by false pretenses states:
 

 The jurors for the State upon their oath present that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully and feloniously did knowingly and designedly with the intent to cheat and defraud obtain and attempt to obtain a Professional Bail Bondsman's License issued by the North Carolina Department of Insurance...."
 

 Both Defendant and the State agree at the time of the alleged acts, Defendant already had his bail bondsman license. The State likens obtaining to retaining. At oral argument, the State asserted "retaining wrongfully is obtaining." The State also contended obtaining a renewal may be obtaining. We disagree.
 

 We conclude the State failed to produce sufficient evidence Defendant
 
 obtained
 
 a professional bail bondsman's license. Defendant received-
 
 obtained
 
 -his license on 26 February 1998. The indictment for this charge lists the dates of offense as 1 July 2009 to 1 July 2014. The State presented no evidence of Defendant's actions prior to 26 February 1998 at trial, and even if it had, there would be a fatal variance between the indictment and the evidence at trial.
 

 While the State likens "retaining" to "obtaining," we conclude retain is not within the definition of obtain. We note, the Department of Insurance has different processes and requirements for
 
 obtaining
 
 a bail bondsman license and
 
 renewing
 
 (retaining) a license. Additionally, the State's assertion at oral argument-Defendant obtained a renewal-is not what the State alleged in the indictment. Instead, the indictment states Defendant obtained "a Professional Bail Bondsman's License", not a "
 
 renewal
 
 of a Professional Bail Bondsman's License."
 
 [16]
 
 Thus the trial court erred by denying Defendant's motion to dismiss the obtaining
 
 *283
 
 property by false pretenses charge.
 
 [17]
 

 State v. Hinton
 
 ,
 
 361 N.C. 207
 
 , 211,
 
 639 S.E.2d 437
 
 , 440 (2007) (citation omitted) ("In construing
 
 *641
 
 ambiguous criminal statutes, we apply the rule of lenity, which requires us to strictly construe the statute.").
 

 F. Selective Prosecution
 

 Finally, Defendant brings forth a selective prosecution argument. He contends: (1) the trial court erred in sustaining the State's objection during his questioning of Wayne Goodwin; and (2) regardless of the court's error, he presented a
 
 prima facia
 
 showing of selective prosecution.
 

 To demonstrate selective prosecution Defendant must:
 

 first, ... make a
 
 prima facie
 
 showing that he has been singled out for prosecution while others similarly situated and committing the same acts have not; second, after doing so, he must demonstrate that the discriminatory selection for prosecution was invidious and done in bad faith in that it rests upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.
 

 State v. Pope
 
 ,
 
 213 N.C. App. 413
 
 , 416,
 
 713 S.E.2d 537
 
 , 540 (2011) (citation and quotation marks omitted).
 

 As included above, during Goodwin's testimony, Defendant began to question Goodwin on the background of the charges at issue, and the State objected. The court allowed Defendant to make a proffer before ruling on the objection. After six questions, the court interrupted, stating it had "difficulty" seeing how the testimony was relevant to the issues at trial. The court stated "if you wish to ask him some questions that would make this relevant, I'd be happy to consider it but I frankly don't hear that yet." Defendant replied, "Your Honor, without going through a bit more I would just say I'm good with that and I'll be done with this witness." Defendant asked the court if he could ask one more question, which
 
 *284
 
 the court allowed. Defendant actually asked an additional six questions. Then Defendant stated he was "just going to stop right there[.]" The court sustained the State's objection. Defendant stated he had no more questions for Goodwin before the jury returned. After the jury returned, Defendant did not ask Goodwin any more questions.
 

 First, we conclude the trial court did not erroneously limit Defendant's offer of proof. As stated
 
 supra
 
 , the court directed Defendant to ask questions which would bring forth relevant testimony. Additionally, the court allowed Defendant to ask several more questions of the witness, and Defendant terminated the questioning.
 

 Second, Defendant failed to make a
 
 prima facie
 
 showing of selective prosecution. Defendant points to two of the State's witnesses' testimonies. First, Steve Bryant testified he investigated "approximately 20" other individuals for the "type of alleged activity" at issue. When Defendant asked Bryant how many of the twenty Bryant criminally charged, Bryant answered he did not have the authority to criminally charge anyone. Defendant asked if Bryant knew of criminal investigations resulting from his investigations, and Bryant answered he knew Defendant "as one of them[.]" Additionally, Bryant had not heard or was not aware of others being charged as a result of his investigations. Another witness, Rebecca Shigley, testified she did not know if other bail bondsmen had been charged "for clerical errors on monthly reports" and her division did "not handle any criminal matters." While Defendant characterizes this testimony as proof of "the total lack of prosecutions of bail bondsmen by the Department for intentionally filing false reports[,]" the testimony does not indicate as such. Accordingly, we conclude the trial court did not err.
 

 IV. Conclusion
 

 For the foregoing reasons, we reverse the trial court's denial of Defendant's motion to dismiss the obtaining property by false pretenses charge. We remand the matter for resentencing. We dismiss Defendant's double jeopardy argument and find no error in the rest of the judgments.
 

 NO ERROR IN PART; DISMISSED IN PART; REVERSED IN PART; REMANDED FOR RESENTENCING.
 

 Judges ELMORE and ZACHARY concur.
 

 [1]
 

 Justin Maldonado's and Cortez Grace's bonds were only included in the falsification of monthly bail bond report information indictment. All other bonds were in both the unlawfully accessing a government computer indictment and falsification of monthly bail bond report information indictment.
 

 [2]
 

 The North Carolina Department of Insurance governs bail bondsmen in North Carolina. The Department of Insurance is split into three divisions: (1) the Bail Bond Regulatory Division, which analyzes complaints and conducts investigations of alleged bail bond violations; (2) the Criminal Investigations Division, which investigates alleged criminal violations arising under Chapter 58 of the General Statutes; and (3) the Agent Services Division, which handles regulation licensing, collection of license fees, and renewal of licenses.
 

 [3]
 

 Although the State introduced into evidence Defendant's demographic record, it is not included in the record on appeal.
 

 [4]
 

 Bryant's testimony did not state who gave the Department of Insurance this information.
 

 [5]
 

 These individuals' names are spelled differently in the bonds and in the trial transcript.
 

 [6]
 

 Bryant did not explain how Defendant violated the eight times rule.
 

 [7]
 

 Pardeau testified he first started investigating "in the latter half of 2014."
 

 [8]
 

 Defendant contends the State did not present evidence he sent these emails.
 

 [9]
 

 The State also called: (1) Kayla Vann, the records custodian for the North Carolina Department of Revenue; and (2) Bryan Huncke, a sergeant with the Union County Sheriff's Office.
 

 [10]
 

 In the issue heading, Defendant asserts the State charged him with a vague and overly broad indictment. Defendant brought forth no substantive argument in support of these contentions.
 

 [11]
 

 In support of his argument, Defendant cites to "the reasons stated above in Issue I[.]"
 

 [12]
 

 Subsection (c) states, "Any person who willfully and without authorization, directly or indirectly, accesses or causes to be accessed any educational testing material or academic or vocational testing scores or grades that are in a government computer is guilty of a Class 1 misdemeanor."
 
 N.C. Gen. Stat. § 14-454.1
 
 (c).
 

 [13]
 

 Defendant also alludes to the possibility of an employee of his uploading the information. However, as stated
 
 supra
 
 , the statute encompasses when a person causes, directly or indirectly, a computer to be accessed.
 
 N.C. Gen. Stat. § 14-454.1
 
 (a). Additionally, the State presented sufficient evidence of access, either directly or indirectly, by Defendant to withstand his motion to dismiss.
 

 [14]
 

 At trial and at oral argument, though not directly in his brief, Defendant argued the SBS system is not a government computer.
 
 N.C. Gen. Stat. § 14-453
 
 (7a) defines a "Government computer" as "any computer, computer program, computer system, computer network, or any part thereof, that is owned, operated, or used by any State or local governmental entity."
 
 N.C. Gen. Stat. § 14-453
 
 (7a) (2017).
 

 [15]
 

 Additionally, in the Legal Thesaurus, "obtain" and "retain" are not listed as synonyms of each other.
 
 Legal Thesaurus
 
 357, 454 (2d ed. 1992).
 

 [16]
 

 At oral argument, the State also contended "attempting to obtain" a license is equivalent to obtaining. While attempting to obtain property is within the crime of obtaining property by false pretenses, the inclusion of "attempt" does not bring "retaining" within the definition of "obtaining."
 

 [17]
 

 Lastly, at oral argument, Defendant contended were this obtaining property by false pretenses charge to "fall", the trial court should have also dismissed the other charges. However, the indictment for the unlawfully accessing a government computer charge states Defendant obtained not only a license, but also "money and fees (premiums) charged in connection with the bonding of individuals[.]" Additionally, the falsifying monthly bail bond report information charge requires no such obtaining. Thus, these charges do not "fall" with the obtaining property by false pretenses charge.
 

 We need not address Defendant's argument about the sufficiency of Pardeau's testimony, as we reverse this charge on other grounds.