DAVIS, Judge.
 

 *138
 

 *682
 
 In this case, we address the quantum of evidence the State must present in order to survive a defendant's motion to dismiss a charge of felony death by vehicle arising out of the presence of narcotics in an unknown quantity in the defendant's blood. Because we are satisfied that the State's evidence was sufficient to raise a jury issue as to whether the defendant was, in fact, appreciably impaired, we conclude that the trial court correctly denied his motion to dismiss.
 

 Factual and Procedural Background
 

 The State's evidence at trial tended to show the following: On 22 July 2015, Joseph Brian Shelton ("Defendant") woke up at 6:30 a.m. and ingested Oxycodone, a drug that had been prescribed by his doctor for pain stemming from injuries he had received in a car accident in 2009. The pharmacist's label on the pill bottle warned that the drug could cause drowsiness or dizziness and thus to "use caution when operating a vehicle, vessel or machine." Despite the fact that his driver's license had been revoked for over a year, Defendant got into his green Dodge pickup truck and drove from his home in Sneads Ferry to his place of employment in Surf City. At 11:00 a.m., Defendant ingested another drug, Tramadol, for which he also possessed a prescription. The Tramadol bottle likewise contained warnings about the drug's potential to cause drowsiness and dizziness.
 

 Defendant left work to drive home at 5:00 p.m. that day. At approximately 5:10, Defendant was driving eastbound on Old Folkstone Road, a two-lane road in Onslow County, behind a silver Ford Range Rover being operated by Robin Jones. At the same time, Rebecca Lovely was driving her vehicle behind Defendant's truck. As these three vehicles traveled along Old Folkstone Road at approximately 45-50 miles per hour, both Jones and Lovely saw 53-year-old Rhonda Anderson standing to the right in a grassy area near a group of "two or three" mailboxes
 
 *683
 
 located about three feet away from the side of the road. Approximately 150 yards away, Lee Hill, who was sitting in a pick-up truck facing Old Folkstone Road, also saw Anderson standing by the mailboxes. Although the road was straight, weather conditions were clear, and it was fully light outside, Defendant did not notice Anderson.
 

 As Jones approached the intersection of Old Folkstone Road and Winery Road, he slowed down to turn left on Winery Road. Defendant attempted to slow down as well, but his brakes failed and "went straight to the floor." Although there was no oncoming traffic in the westbound lane to Defendant's immediate left, he swerved to the right through the grassy area and into a ditch. As he did so, Defendant's truck struck Anderson, causing her body to fly 59 feet through the air before hitting the ground. Defendant's truck also hit the rear of Jones' vehicle, causing the truck's driver's side mirror to become detached. Unaware that his truck had collided with Anderson and despite the failure of his brakes moments earlier, Defendant chose to accelerate out of the ditch and drive to his home where he was forced to use his emergency brakes to bring his truck to a stop in his driveway.
 

 At the scene of the collision, Lovely called 911 and went over to the area where Anderson's body had landed. She observed that Anderson was "laying on her back, with both of her legs up on [the] other side of her body ... [Anderson's] head was bleeding through her hair.... She wasn't breathing.... and there were no signs of life." Paramedics arrived and declared Anderson dead on the scene.
 

 Dr. William Kelly, a forensic pathologist who examined Anderson's body, found that the cause of death was "multiple blunt trauma." He testified that Anderson's skull was fractured and that she also had a large open fracture of her right hip. In addition, Anderson's left femur was broken, and she had a five-inch-long bruise along the lower part of her left leg.
 

 The collision was investigated by the North Carolina State Highway Patrol. After a call went out that the hit-and-run driver was operating a green Dodge pickup truck missing its driver's side mirror, Trooper James Kirk responded to the call and patrolled the area surrounding the scene of the accident in an attempt to find a vehicle matching that description. At 6:45 p.m.,
 
 *139
 
 Trooper Kirk observed Defendant's green Dodge pickup truck parked in his driveway. Trooper Kirk pulled into the driveway, exited his vehicle to look at the truck, and saw that the driver's side mirror was missing. As Trooper Kirk was inspecting the truck, Defendant came outside and stated that he knew that Trooper Kirk was there about "the wreck [Defendant] was in on Old Folkstone Road."
 
 *684
 
 Trooper Kirk took Defendant to his patrol car and advised him of his
 
 Miranda
 
 rights, which Defendant waived. In addition to answering Trooper Kirk's questions, Defendant also wrote out a statement, explaining that "when [the] vehicle in front of me had slammed on [his] brakes very unexpected, I tried to stop but my brake pedal failed and went straight to the floor." Defendant also told Trooper Kirk that he "swerved to the right so [he] wouldn't hit another car head-on, but [he] just did clip the truck." Defendant explained that because he knew his license had been revoked, he "panicked" and fled the scene.
 

 Trooper Kirk was aware that a pedestrian had been involved in the collision but did not yet know the extent of her injuries. For this reason, he did not question Defendant about his truck striking Anderson. Nor did Defendant mention having hit anyone with his truck. Defendant told Trooper Kirk he had not consumed any alcohol that day. At 7:05 p.m., Trooper Kirk gave Defendant a portable breathalyzer test, which confirmed the absence of alcohol in Defendant's body. Trooper Kirk did not ask Defendant if he had ingested any other controlled substances, and Defendant did not volunteer the information that he had taken either Oxycodone or Tramadol.
 

 Troopers Johnathan Acuna and Matt Bryan responded to the scene of the collision at approximately 6:00 p.m. Trooper Acuna was the lead investigator, and Trooper Bryan collected evidence. Trooper Acuna learned from paramedics that Anderson had died on the scene. He interviewed Lovely, Jones, and other witnesses and took their statements. After the scene was cleared, Troopers Acuna and Bryan went to Defendant's home.
 

 At Defendant's residence, Trooper Acuna interviewed Defendant in his patrol car. Defendant did not volunteer much information but was polite and cooperative and answered all of Trooper Acuna's questions. Once again, Defendant was not asked whether he had consumed any controlled substances and did not affirmatively disclose to the officers the fact that he had taken either Oxycodone or Tramadol earlier that day.
 

 During the interview, Trooper Acuna told Defendant that his vehicle had struck Anderson and that she had been killed. Defendant "didn't believe it" and "seemed pretty upset." Trooper Bryan obtained a search warrant for Defendant's truck and arranged to have it towed from his home. While backing Defendant's truck out of the driveway for the tow truck, Trooper Bryan attempted to apply the brakes, but the pedal went all the way to the floor. Trooper Acuna subsequently conducted an inspection of Defendant's truck on 27 July 2015 during which he noted a mechanical brake failure and concluded that the "vehicle has no brakes."
 

 *685
 
 In accordance with the protocol followed by the Highway Patrol in connection with fatal motor vehicle accidents, Trooper Bryan obtained a search warrant to collect a sample of Defendant's blood on the night of the accident. The blood sample was submitted to the crime laboratory of the North Carolina State Bureau of Investigation ("SBI") where chemical analyst Natasha Testa ultimately determined that both Oxycodone and Tramadol were present in Defendant's blood.
 

 On the night of the collision, Trooper Acuna charged Defendant with a number of offenses, including misdemeanor death by vehicle, failure to reduce speed to avoid a collision, failure to report an accident resulting in property damage in excess of $1,000, operating a motor vehicle with improper brakes, and driving with license revoked. Defendant was not charged by Trooper Acuna with driving while impaired.
 

 On 13 October 2015-which was after the results of Defendant's blood test revealed the presence of Oxycodone and Tramadol in his blood-Defendant was indicted by an Onslow County grand jury on charges of second-degree murder, felony death by vehicle, driving
 
 *140
 
 with no liability insurance, felony hit and run by failing to immediately stop at the scene of an accident, felony hit and run by failing to remain at the scene of an accident, misdemeanor death by vehicle, failure to reduce speed to avoid a collision, failure to report an accident resulting in property damage in excess of $1,000, operating a motor vehicle with improper brakes, and driving with license revoked. Prior to Defendant's trial, the charges of failure to report an accident, failure to reduce speed to avoid a collision, driving with no liability insurance, and felonious hit and run by failing to remain at the scene of an accident were dismissed.
 

 A jury trial was held beginning on 1 May 2017 in Onslow County Superior Court before the Honorable Charles H. Henry. The State called fourteen witnesses, including Lovely, Jones, and Hill; the responding troopers; the medical personnel who examined Anderson; and several expert witnesses, including Testa. Testa testified to the following: (1) she had tested the sample of Defendant's blood for the presence of impairing substances; (2) her tests showed that Oxycodone and Tramadol were present in his blood; (3) the tests revealed the presence of these drugs in amounts equal to or greater than 25 nanograms per milliliter-the "detection limits" used by the SBI for the test; (4) the half-lives of Oxycodone and Tramadol are approximately three to six hours and four to seven hours, respectively; (5) she was unable to determine the precise quantities of the drugs present in Defendant's blood; and (6) she was not able to accurately determine from the test results whether Defendant would have been impaired at the time of the 22 July 2015 accident.
 

 *686
 
 Defendant testified on his own behalf and elicited testimony from four additional witnesses, including three character witnesses and an expert in the field of pharmacology, Professor Brian McMillen. Professor McMillen offered his opinions that (1) he would "not expect to see impairment" in a person who had 25 nanograms per milliliter of both substances in his bloodstream; and (2) people who frequently take Oxycodone and Tramadol develop "a great deal of tolerance" to the drugs.
 

 Defendant moved to dismiss all charges at the close of the State's evidence and again at the close of all the evidence. Both of these motions were denied. On 8 May 2017, the jury found Defendant not guilty of second-degree murder but guilty of the lesser-included offense of involuntary manslaughter as well as of the offenses of felony death by motor vehicle, driving with improper brakes, driving with license revoked, misdemeanor death by motor vehicle, and felonious hit and run resulting in serious injury or death.
 
 [1]
 

 On 10 May 2017, Defendant was sentenced to a term of 73 to 100 months imprisonment for the charge of felony death by motor vehicle. All of the remaining convictions were consolidated with the felony hit and run resulting in serious injury or death conviction for which Defendant was sentenced to a consecutive term of 17 to 30 months imprisonment. Defendant gave timely notice of appeal to this Court.
 

 Analysis
 

 On appeal, Defendant contends that the trial court erred by: (1) denying his motion to dismiss the charge of felony death by vehicle; (2) refusing to allow testimony from Trooper Acuna that Defendant was never charged with driving while impaired; and (3) failing to intervene
 
 ex mero motu
 
 during the State's closing argument. We address each argument in turn.
 

 I. Motion to Dismiss
 

 "A trial court's denial of a defendant's motion to dismiss is reviewed
 
 de novo
 
 ."
 
 State v. Watkins
 
 ,
 
 247 N.C. App. 391
 
 , 394,
 
 785 S.E.2d 175
 
 , 177 (citation omitted),
 
 disc. review denied
 
 ,
 
 369 N.C. 40
 
 ,
 
 792 S.E.2d 508
 
 (2016). On appeal, this Court must determine "whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator[.]"
 
 State v. Fritsch
 
 ,
 
 351 N.C. 373
 
 , 378,
 
 526 S.E.2d 451
 
 , 455 (citation omitted),
 
 *141
 

 cert. denied
 
 ,
 
 531 U.S. 890
 
 ,
 
 121 S.Ct. 213
 
 ,
 
 148 L.Ed.2d 150
 
 (2000).
 
 *687
 
 Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
 
 State v. Smith
 
 ,
 
 300 N.C. 71
 
 , 78-79,
 
 265 S.E.2d 164
 
 , 169 (1980) (citation omitted). Evidence may be substantial whether it is "direct, circumstantial, or both[.]"
 
 State v. Abshire,
 

 363 N.C. 322
 
 , 328,
 
 677 S.E.2d 444
 
 , 449 (2009).
 

 When reviewing a motion to dismiss, courts are concerned solely "with the sufficiency of the evidence to carry the case to the jury and not with its weight."
 
 State v. Smith
 
 ,
 
 40 N.C. App. 72
 
 , 80,
 
 252 S.E.2d 535
 
 , 541 (1979) (citation omitted). The evidence must be viewed in the light most favorable to the State, "giving the State the benefit of every reasonable inference and resolving any contradictions in its favor."
 
 State v. Rose
 
 ,
 
 339 N.C. 172
 
 , 192,
 
 451 S.E.2d 211
 
 , 223 (1994) (citation omitted),
 
 cert. denied
 
 ,
 
 515 U.S. 1135
 
 ,
 
 115 S.Ct. 2565
 
 ,
 
 132 L.Ed.2d 818
 
 (1995). Any discrepancies in the evidence "are for the jury to resolve and do not warrant dismissal."
 
 Smith
 
 ,
 
 300 N.C. at 78
 
 ,
 
 265 S.E.2d at 169
 
 . "The defendant's evidence, unless favorable to the State, is not to be taken into consideration. However, if the defendant's evidence is consistent with the State's evidence, then the defendant's evidence may be used to explain or clarify that offered by the State."
 
 State v. Nabors
 
 ,
 
 365 N.C. 306
 
 , 312,
 
 718 S.E.2d 623
 
 , 627 (2011) (internal citations and quotation marks omitted).
 

 Our General Assembly has defined the crime of felony death by vehicle, in pertinent part, as follows:
 

 (a1) Felony Death by Vehicle.-A person commits the offense of felony death by vehicle if:
 

 (1) The person unintentionally causes the death of another person,
 

 (2) The person was engaged in the offense of impaired driving under G.S. 20-138.1 ..., and
 

 (3) The commission of the offense in subdivision (2) of this subsection is the proximate cause of death.
 

 N.C. Gen. Stat. § 20-141.4
 
 (2017).
 

 The offense of driving while impaired is, in turn, defined in
 
 N.C. Gen. Stat. § 20-138.1
 
 .
 

 (a) Offense.-A person commits the offense of impaired driving if he drives any vehicle upon any highway, any street, or any public vehicular area within this State:
 

 (1) While under the influence of an impairing substance; or
 
 *688
 
 (2) After having consumed sufficient alcohol that he has, at any relevant time after the driving, an alcohol concentration of 0.08 or more. The results of a chemical analysis shall be deemed sufficient evidence to prove a person's alcohol concentration; or
 

 (3) With any amount of a Schedule I controlled substance, as listed in G.S. 90-89, or its metabolites in his blood or urine.
 

 N.C. Gen. Stat. § 20-138.1
 
 (2017).
 

 Here, Defendant was convicted of felony death by vehicle based on the theory of impairment set out in
 
 N.C. Gen. Stat. § 20-138.1
 
 (a)(1). This Court has held that "[t]o support a charge of driving while impaired, the State must prove that the defendant has ... taken a sufficient amount of narcotic drugs, to cause him to lose the normal control of his bodily or mental facilities, or both, to such an extent that there is an appreciable impairment of either or both of these faculties."
 
 State v. Norton
 
 ,
 
 213 N.C. App. 75
 
 , 78,
 
 712 S.E.2d 387
 
 , 390 (2011) (internal citation and quotation marks omitted). The fact that a motorist has consumed impairing substances "when considered in connection with faulty driving or other conduct indicating an impairment of physical and mental faculties, is sufficient
 
 prima facie
 
 to show a violation of
 
 N.C. Gen. Stat. § 20-138.1
 
 ."
 

 Id.
 

 at 79
 
 ,
 
 712 S.E.2d at 390
 
 (internal quotation marks, brackets, and citation omitted).
 

 Defendant argues that the trial court erred by denying his motion to dismiss because there was a lack of substantial evidence that he was actually impaired at the time he struck Anderson as a result of his prior ingestion of Tramadol or Oxycodone.
 
 [2]
 
 He
 
 *142
 
 contends that the State's evidence merely showed negligence regarding his operation of his truck at the time of the collision as opposed to giving rise to a reasonable inference that he was impaired. We disagree.
 

 It is undisputed that Defendant ingested both drugs on the day of the accident and that they were still present in his blood after the crash. Taking these facts together with the evidence at trial regarding Defendant's lack of awareness of the circumstances around him and his
 
 *689
 
 conduct before and after the collision, reasonable jurors could-and did-find that Defendant was appreciably impaired.
 

 First, evidence was presented that the labels on the bottles of Tramadol and Oxycodone warned that they may cause drowsiness or dizziness and that care should be taken when operating a vehicle after their ingestion. Under North Carolina law, Oxycodone and Tramadol are classified as Schedule II and Schedule IV controlled substances, respectively.
 
 See
 

 N.C. Gen. Stat. §§ 90-90
 
 (1)(a)(14), 90-92(a)(5) (2017).
 

 Second, Defendant testified that he failed to see Anderson standing on the side of the road before the accident despite the fact that it was daytime, visibility was clear, and the road was straight. Moreover, all three of the eyewitnesses who testified at trial-one of whom was at least 150 yards away-were able to see Anderson before Defendant struck her with his truck.
 

 Third, Defendant admitted that following the accident he was unaware that his vehicle had even collided with a human being despite the fact that the impact of the collision was sufficiently strong to cause Anderson's body to fly 59 feet through the air down the side of Old Folkstone Road. Fourth, although Defendant testified that his brakes had completely stopped functioning when he attempted to slow down immediately prior to the accident, he decided not to remain at the scene and instead elected to drive his truck out of the ditch back onto Old Folkstone Road and all the way to his home despite the fact that the vehicle lacked operable brakes.
 

 None of this evidence conclusively established that Defendant was legally impaired. But that is not the question before us. Rather, the sole issue is whether sufficient evidence was presented that
 
 could
 
 have led a rational jury to conclude that Defendant was, in fact, impaired. We are unable to agree with Defendant that this standard was not met. The evidence discussed above lends itself to a reasonable inference that Defendant's senses were appreciably impaired at the time of the collision.
 

 Moreover, we reject Defendant's attempt to separate the concepts of negligence and impairment in this context as mutually exclusive. While the evidence certainly shows, at a bare minimum, negligent driving by Defendant, it also supports the conclusion that such negligence was caused by Defendant's impairment due to his ingestion of Tramadol and Oxycodone earlier that day.
 

 Although Defendant also argues that the failure of his brakes was a cause of the accident, the fact that his brakes were in poor condition is
 
 *690
 
 not incompatible with the proposition that he was driving while impaired and that his impairment constituted a proximate cause of the death of Anderson. Based on the evidence presented at trial, the jury could reasonably have concluded that a non-impaired driver-upon realizing his brakes were inoperable-would not have chosen to swerve in the direction of a person standing on the side of the road whose presence should have been clearly visible to him.
 
 [3]
 

 Defendant further points to the evidence that the troopers who met with him following the accident did not charge him with driving while impaired. However, although this fact could support an inference of a lack of impairment, when reviewing the trial court's
 
 *143
 
 denial of a defendant's motion to dismiss we are required to draw every reasonable inference and resolve every conflict in the
 
 State's
 
 favor-not the defendant's.
 
 [4]
 

 See
 

 Rose
 
 ,
 
 339 N.C. at 192
 
 ,
 
 451 S.E.2d at 223
 
 . The other evidence discussed above-taken in the light most favorable to the State-was sufficient to support a finding that Defendant was, in fact, impaired.
 

 In reaching this result, we are guided by our Supreme Court's decision in
 
 Atkins v. Moye
 
 ,
 
 277 N.C. 179
 
 ,
 
 176 S.E.2d 789
 
 (1970). In
 
 Atkins
 
 , the plaintiff was driving on a highway at night in the rain and fog when he collided with the defendant's truck-which was stopped in the plaintiff's lane of travel-that the plaintiff failed to see in time to prevent the accident.
 
 Id.
 
 at 180-81,
 
 176 S.E.2d at 790-91
 
 . The plaintiff did not "break his speed" before he hit the defendant's truck with his vehicle.
 
 Id.
 
 at 185,
 
 176 S.E.2d at 793
 
 . After the accident, the defendant detected an odor of alcohol on the plaintiff's breath.
 

 Id.
 

 The investigating officer smelled alcohol in the plaintiff's vehicle and observed that there was a pint bottle containing a small amount of whiskey on the floorboard under the front seat of the plaintiff's car.
 

 Id.
 

 The plaintiff brought a civil action in which he alleged negligence on the part of the defendant.
 
 Id.
 
 at 181,
 
 176 S.E.2d at 791
 
 . The defendant asserted the defense of contributory negligence, arguing that the plaintiff had caused the accident by operating his vehicle while under the
 
 *691
 
 influence of alcohol.
 
 Id
 
 . At trial, the jury determined that the plaintiff had, in fact, been contributorily negligent due to his impairment resulting from his prior consumption of alcohol.
 
 Id.
 
 at 183,
 
 176 S.E.2d at 792
 
 .
 

 Our Supreme Court held that the evidence presented was sufficient to support the jury's verdict, noting that the plaintiff was traveling 30 miles per hour upon a straight road and failed to see the tractor trailer until he was ten feet away despite the presence of blinking lights and reflectors.
 
 Id.
 
 at 185,
 
 176 S.E.2d at 793
 
 . In its opinion, the Court further explained its ruling as follows:
 

 An odor of alcohol on the breath of the driver of an automobile is evidence that he has been drinking. However, an odor,
 
 standing alone
 
 , is no evidence that he is under the influence of an intoxicant, and the
 
 mere
 
 fact that one has had a drink will not support such a finding. Notwithstanding, the fact that a motorist has been drinking, when considered in connection with faulty driving or other conduct indicating an impairment of physical or mental faculties, is sufficient
 
 prima facie
 
 to show [impairment].
 

 We hold that the evidence of the "broken pint" and the odor of alcohol on plaintiff's breath and in his automobile, when taken in conjunction with his failure to take any action to avoid a collision with the truck, was sufficient to support a finding that plaintiff's faculties had been appreciably impaired by the consumption of an alcoholic beverage. It is quite true ... that the only testimony of any odor of alcohol on plaintiff's breath came from defendant.... We also note that plaintiff testified he had consumed no alcoholic beverages all day and that he failed to see the truck because the lights of an approaching car, reflected on the wet, blacktop pavement, blinded him. The credibility of the witnesses and conflicts in the evidence, however, are for the jury, not the court.
 

 Id.
 
 at 185-86,
 
 176 S.E.2d at 793-94
 
 (internal citations, quotation marks, brackets, and ellipses omitted).
 

 Thus,
 
 Atkins
 
 stands for the proposition that impairment can be shown by a combination of evidence that a defendant has both (1) ingested an impairing substance; and (2) operated his vehicle in a manner showing he was so oblivious to a visible risk of harm as to raise an inference that his senses were appreciably impaired.
 

 *692
 
 While Defendant argues that the upholding of his conviction for felony death by
 
 *144
 
 vehicle will have the effect of creating a strict liability standard for persons who lawfully take prescription drugs and then are parties to a motor vehicle collision caused by their negligent driving, this contention is misplaced for several reasons. First, the circumstances of every case are different, and not every accident involving a driver who has ingested prescription drugs will raise an inference that the driver was appreciably impaired. Second, even in cases where a defendant is charged with an offense based on impaired driving under such circumstances, it is ultimately the role of the jury to determine whether the defendant was actually impaired and whether the impairment was a proximate cause of the accident.
 

 Finally, we wish to emphasize that our holding today does not break new legal ground as we are simply applying in the context of prescription drugs the same rules that apply to driving after consuming alcohol.
 
 [5]
 
 It is not
 
 per se
 
 illegal to operate a motor vehicle after consuming alcohol just as it is not-without more-illegal to do so after ingesting prescription drugs. But both are potentially impairing substances, and criminal liability attaches when a driver operates a vehicle despite being appreciably impaired. As
 
 Atkins
 
 demonstrates, this is not a novel proposition.
 

 Were we to accept Defendant's argument, it is unclear how a jury would ever have the opportunity to determine whether a driver with an indeterminate amount of drugs in his bloodstream was impaired in the absence of opinion testimony from an officer-regardless of the strength of the evidence showing that he was oblivious to an obvious risk of harm to others. Neither law nor logic supports such a result.
 

 It was the role of the jury to determine based on the evidence presented at trial whether (1) Defendant was appreciably impaired due to his ingestion of one or both of the controlled substances he had taken earlier that day; and (2) whether his impairment was a proximate cause of Anderson's death. We therefore conclude that the trial court properly denied Defendant's motion to dismiss.
 

 *693
 

 II. Exclusion of Trooper Acuna's Testimony
 

 Defendant also contends that the trial court committed reversible error in excluding Trooper Acuna's testimony as to the fact that he did not charge Defendant with the offense of driving while impaired. On cross-examination, the following exchange occurred.
 

 [DEFENDANT'S COUNSEL]: What did you tell [Defendant] he was under arrest for?
 

 [PROSECUTOR]: Objection.
 

 THE COURT: Sustained.
 

 [TROOPER ACUNA]: I believe-
 

 [DEFENDANT'S COUNSEL]: Wait a minute.
 

 [PROSECUTOR]: Don't answer that.
 

 THE COURT: I sustained the objection.
 

 [DEFENDANT'S COUNSEL]: What charges did you charge him with?
 

 [PROSECUTOR]: Objection.
 

 THE COURT: Sustained.
 

 [DEFENDANT'S COUNSEL]: Did you charge him with driving while impaired?
 

 [PROSECUTOR]: Objection.
 

 THE COURT: Sustained.
 

 "A trial court's evidentiary rulings are subject to appellate review for an abuse of discretion, and will be reversed only upon a finding that the ruling was so arbitrary that it could not be the result of a reasoned decision."
 
 Lord v. Customized Consulting Specialty, Inc.
 
 ,
 
 182 N.C. App. 635
 
 , 644-45,
 
 643 S.E.2d 28
 
 , 33-34 (citation omitted),
 
 disc. review denied
 
 ,
 
 361 N.C. 694
 
 ,
 
 652 S.E.2d 647
 
 (2007). It is well established that "[e]ven if the complaining party can show that the trial court erred in its ruling, ordinarily relief will not be granted absent a showing of prejudice."
 
 State v. Herring
 
 ,
 
 322 N.C. 733
 
 , 749,
 
 370 S.E.2d 363
 
 , 373 (1988).
 

 *145
 
 Even assuming-without deciding-that the trial court erred in sustaining the State's objections to questioning by Defendant's counsel regarding whether Defendant had been charged with driving while impaired, Defendant has failed to show that he was prejudiced by any
 
 *694
 
 such error. Despite the trial court's exclusion of this testimony, it would have been apparent to the jury that Defendant was never charged with that offense. Troopers Acuna and Kirk both testified that they did not form an opinion that Defendant was impaired based on their interactions with him on the day of the accident. Moreover, in his closing argument the prosecutor expressly acknowledged that the Defendant was not separately charged with driving while impaired.
 

 Therefore, Defendant cannot establish prejudice from the trial court's exclusion of this testimony.
 
 See
 

 State v. Boone
 
 ,
 
 302 N.C. 561
 
 , 565,
 
 276 S.E.2d 354
 
 , 357 (1981) (holding that trial court's exclusion of testimony, while erroneous, was not prejudicial).
 

 III. Closing Argument
 

 Finally, Defendant argues that the trial court reversibly erred in failing to intervene
 
 ex mero motu
 
 during the State's closing argument. Specifically, he contends that the prosecutor's argument was grossly improper in that it (1) incorrectly stated the legal standard for impairment; and (2) improperly appealed to the passion and prejudice of the jury.
 

 "The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene
 
 ex mero motu
 
 ."
 
 State v. Jones
 
 ,
 
 355 N.C. 117
 
 , 133,
 
 558 S.E.2d 97
 
 , 107 (2002) (citation omitted). Our Supreme Court has held that "[i]n determining whether the [State's] argument was grossly improper, this Court must examine the argument in the context in which it was given and in light of the overall factual circumstances to which it refers."
 
 State v. Tyler
 
 ,
 
 346 N.C. 187
 
 , 205,
 
 485 S.E.2d 599
 
 , 609 (citation omitted),
 
 cert. denied
 
 ,
 
 522 U.S. 1001
 
 ,
 
 118 S.Ct. 571
 
 ,
 
 139 L.Ed.2d 411
 
 (1997).
 

 Defendant initially challenges the following portion of the State's closing argument:
 

 So, the controlled substances that were present in Joseph Shelton's blood at the time of this collision, Oxycodone and Tramadol, and those are impairing substances, the presence of these drugs in his blood hours after the collision.
 

 And the laws of the State of North Carolina allow for you to find persons guilty of impaired driving if they have in their blood controlled substances.
 

 *146
 

 *695
 
 And the State submits to you that these controlled substances were in his blood and he was impaired by those controlled substances and you must follow the law in this case.
 

 Defendant contends that these statements were legally incorrect because in order to convict Defendant of felony death by vehicle the jury had to find beyond a reasonable doubt not merely that impairing substances were present in Defendant's bloodstream but also that he was appreciably impaired at the time of the accident. However, in his brief, Defendant selectively quotes from this portion of the State's argument and omits other statements in which the prosecutor made clear that Defendant could only be convicted if he was, in fact, legally impaired. The relevant portion of the State's argument-in its entirety-stated as follows:
 

 The State alleges and has proven to you that the defendant was impaired by a controlled substance at the time of this collision.
 

 And you will find that the defendant is impaired if you find that he was under the influence of an impairing substance, which is what the Court will tell you the law is.
 

 So, the controlled substances that were present in Joseph Shelton's blood at the time of this collision, Oxycodone and Tramadol, and those are impairing substances, the presence of these drugs in his blood hours after the collision.
 

 And the laws of the State of North Carolina allow for you to find persons guilty of impaired driving if they have in their blood controlled substances.
 

 And the State submits to you that these controlled substances were in his blood and
 
 he was impaired by those controlled substances and you must follow the law in this case.
 

 (Emphasis added.)
 

 Therefore, when considered contextually the statements cited by Defendant from the State's closing argument did not require intervention
 
 ex mero motu
 
 by the trial court. Furthermore, following closing arguments, the trial court instructed the jury on the issue of impairment, and Defendant has not challenged this instruction.
 

 *696
 
 In addition, Defendant contends that the State improperly appealed to the jury's passion and prejudice in the following portion of its closing argument.
 

 The people of the State of North Carolina are entitled to guilty verdicts for what he did to her. Her family is entitled to justice for how he left her.
 

 And you can send a message with your verdicts that this will not be tolerated. Let Joseph Shelton know that this will not be tolerated. That he'll be held accountable. Let Rhonda Anderson's family right there know that justice will be served and let the community, the community, right, let them know that people who drive while impaired will be severely punished.
 

 You must not let Joseph Shelton who drove under the influence with his history on a revoked license that ran over that woman and left her there for dead walk out of this courtroom with nothing more than a misdemeanor.
 

 You are the moral voice and conscience of this community, the community you live in, and you can be the somebody that ought to do something. If you don't act, no one can. If you don't decide, no one can.
 

 And the moment of decision is here. It's here. You go back in that jury room, search your heart, search your mind, decide what you think is right. It's not going to be easy, but you've got to decide.
 

 Our Supreme Court has held that it is permissible for a prosecutor to argue "that for purposes of defendant's trial, they are the voice and conscience of the community."
 
 State v. Brown
 
 ,
 
 320 N.C. 179
 
 , 204,
 
 358 S.E.2d 1
 
 , 18,
 
 cert. denied
 
 ,
 
 484 U.S. 970
 
 ,
 
 108 S.Ct. 467
 
 ,
 
 98 L.Ed.2d 406
 
 (1987). It is also not improper for prosecutors to "tell the jury that its verdict will send a message to the community[.]"
 
 State v. Golphin
 
 ,
 
 352 N.C. 364
 
 , 471,
 
 533 S.E.2d 168
 
 , 237 (2000) (quotation marks and citation omitted),
 
 cert. denied
 
 ,
 
 532 U.S. 931
 
 ,
 
 149 L.Ed.2d 305
 
 (2001).
 

 Based on our careful review of the transcript, we are once again unable to agree with Defendant that the State's argument was so grossly improper that intervention
 
 ex mero motu
 
 was required. Accordingly, Defendant's argument is overruled.
 

 *697
 

 Conclusion
 

 For the reasons stated above, we conclude that Defendant received a fair trial free from error.
 

 NO ERROR.
 

 Judges BRYANT and STROUD concur.
 

 [1]
 

 Following the jury's verdict, the trial court arrested judgment on Defendant's convictions for involuntary manslaughter and misdemeanor death by vehicle.
 

 [2]
 

 We note that unlike
 
 N.C. Gen. Stat. § 20-138.1
 
 (a)(3), which provides that operating a vehicle with
 
 any
 
 amount of a Schedule I drug present in one's blood or urine constitutes driving while impaired, § 20-138.1(a)(1) requires a finding that the defendant was actually driving "
 
 under the influence
 
 of an impairing substance" in order for criminal liability to attach.
 
 N.C. Gen. Stat. §§ 20-138.1
 
 (a)(1), (3) (emphasis added).
 

 [3]
 

 Indeed, Jones testified that there was no oncoming traffic in the westbound lane at the time of the accident, meaning that Defendant could have safely swerved to the left in order to avoid striking both Jones' vehicle and Anderson.
 

 [4]
 

 It is undisputed that Defendant did not inform the law enforcement officers about his ingestion of Oxycodone or Tramadol. We observe that signs of drowsiness-a side effect of both Oxycodone and Tramadol -would have been less readily apparent during an interview under these circumstances than, for example, the odor of alcohol or bloodshot and glassy eyes typically exhibited by one who has recently consumed alcohol.
 

 [5]
 

 While the State did not dispute the fact that Defendant possessed prescriptions for Oxycodone and Tramadol, the potentially impairing effects of these substances are the same whether they are taken with or without a prescription. Although Defendant presented testimony suggesting that frequent users of these drugs often develop a tolerance for these side effects, it was up to the jury to decide the appropriate weight to give that evidence.